IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CHARLTON EARLE JENNINGS

        Plaintiff               :    C.A. No. 02 -210 Erie

        vs.                  :    JUDGE COHILL

ERIE COUNTY DISTRICT ATTORNEY'S
OFFICE, DISTRICT ATTORNEY BRAD FOULK
ERIE POLICE DEPARTMENT
EX-EPD CHIEF PAUL DeDIONISIO
          Defendants


**APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1. Criminal Information at Erie County Court of Common Pleas No. 2409 of 2000
2. Docket information showing Plaintiff's convictions
3. Portion of testimony of Defendant Donald Knepper at Plaintiff's trial
4. Portion of testimony of H. Gregory Strickland at Plaintiffs trial
5. Portion of testimony of John Lubhahn MD at Plaintiffs trial
6. Superior Court of Pennsylvania opinion affirming convictions


        Respectfully Submitted


        OFFICE OF ERIE CITY SOLICITOR


By:        **J~A**

        Gerald J. Villella, Esq.
        PA ID 32814
        626 State Street, Room 505
        Erie, PA 16501
        (814) 870-1230

# PART 1.
# CRIMINAL INFORMATION AT ERIE COUNTY COMMON PLEAS NO.2409 OF 2000

COMMONWEALTH OF PENNSYLVANIA

V.

CHARLETON EARL **JENNINGS**

**IN** THE COURT OF COMMON PLEAS

OF ERIE COUNTY, PENNSYLVANIA

NO. 2406 OF 2000
H 123247-5

INFORMATTQ 4

The District Attorney of *Erie County by* this Information charges that on (or about), July 7, 2000, **in** the said County of Erie and State of Pennsylvania the said CHARLETON EARL JENNINGS with intent to commit the crime of CRIMINAL HOMICIDE did attempt to cause the death of Officer Jay White of the Erie Police Department by discharging one round with a Ruger 9mm semi-automatic gun striking Officer Jay White in the groin which act constituted a substantial step towards the commission of that crime, occurring at the 1800 block of East 12`ʰ Street and Downing Avene, East 12th -- East 18ᵗʰ Street vicinity of *Conrail and* CSX`ʳailroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of CRIMINAL ATTEMPT, a felony of the first degree.

COUNT TWO ⁝ ᴾ (⁝

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS with intent to commit the crime of CRIMINAL HOMICIDE did attempt to cause the death of Officer Paul McMahon of the Erie Police Department by discharging one round with a Ruger 9mm semi-automatic gun which struck Officer Paul McMahon which act constituted a substantial step towards the commission of that crime, occurring at the 1800 block of East 12th Street and Downing Avene, East 12th - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of CRIMINAL ATTEMPT, a felony of the first degree.

ⲅ COUNT THREE:     ᵘʳ

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said **CHARLETON EARL JENNINGS** with intent to commit the crime of CRIMINAL HOMICIDE did attempt to cause the death of Officer Terry Dawley of the Erie Police Department by discharging numerous rounds with a Ruger 9mm semi-automatic gun striking Officer Terry Dawley three times *which* act constituted a substantial step towards the commission of that crime, occurring at the 1800 block of East 12 ̏ Street and Downing Avene, East 12`" - East 18" Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of CRIMINAL ATTEMPT, a felony of the first degree.

~o9OUNT FOUR :

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the **said** County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did attempt to cause serious bodily injury to another, or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life, to-wit: Officer Jay White of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot the said officer with a Ruger 9mm semi-automatic gun causing injury to his groin; occurring at the 1800 block of East 12th Street and Downing Avene, East 12th - East 18th Street vicinity of *Conrail and CSX* railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of AGGRAVATED ASSAULT, a felony of the first degree.

COUNT FIVE: NG

AND THE DISTRICT ATTORNEY FURTHER CHARGES that *on* the day and year aforesaid in the **said** County of Erie and State of *Pennsylvania*, the said CHARLETON EARL JENNINGS did attempt to cause serious *bodily* injury to another, or caused such injury *intentionally*, knowingly or recklessly under circumstances manifesting extreme indifference *to* the value of human life, to-wit: Officer Paul McMahon of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot the said officer with **a Ruger 9mm semi-**automatic gun causing injury to a left finger; occurring at the 1800 block of East 12th Street and *Downing* Avene, East 12$^{i}$h - East 18th Street vicinity of Conrail and CSX railroad **tracks**, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of AGGRAVATED ASSAULT, a felony of the first degree.

COUNT SIX:  ^{t<'l

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the **said** County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did attempt to cause serious bodily injury to *another*, or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life, to-wit: Officer Terry Dawley of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot the said officer with a Ruger 9mm semi-automatic gun causing injury to his left hand, left thigh and right knee; occurring at the 1800 block of East 12th Street and Downing Avene, East 12th - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the **said** CHARLETON EARL JENNINGS did commit the crime of AGGRAVATED ASSAULT, 'a felony of the first degree.

PUNT SEVEN:, ~¹ ⁹ᴶ'

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did recklessly engage in conduct which placed or may have placed another person *in* danger of death or serious bodily injury, to-wit: Officer Jay White, in that the said CHARLETON EARL JENNINGS did shoot one round at the said victim with a Ruger 9mm semi-automatic gun occurring at the 1800 block of East 12th Street and Downing Avene, East 12th - East 18tʰ Street vicinity of Conrail *and CSX* railroad tracks, Erie, Pennsylvania; thereby the **said** CHARLETON EARL **JENNINGS** did commit the crime of RECKLESSLY **ENDANGERING ANOTHER** PERSON, a misdemeanor of the second degree.

COUNT EIGHT: ⁶⁴¹ _.

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did recklessly engage in conduct which placed or may have placed another person in danger of death or serious bodily injury, to-wit: Officer Paul McMahon, in that the said CHARLETON EARL JENNINGS did shoot fifteen rounds at or near the said victim with a Ruger 9mm semi-automatic gun occurring at the 1800 block of East 12ᵗʰ Street and Downing Avene, East 12th - East 18tʰ Street vicinity of Conrail and CSX railroad tracks, Erie, ·Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of RECKLESSLY ENDANGERING ANOTHER PERSON, a misdemeanor of the second degree.

COUNT NINE; **1-e-r** **e**‾\

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did recklessly engage in conduct which placed or may have placed another person in danger of death or serious *bodily* injury, to-wit: Officer Terry Dawley of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot fifteen rounds at or near the said victim with a Ruger 9mm semi-automatic gun occurring at the 1800 *block* of East 12Th Street and Downing Avene, East 12tʰ - East 18`ʰ Street vicinity of Conrail and Ⅽ SX railroad tracks, Erie, Pennsylvania; thereby the said *CHARLETON* EARL JENNINGS did commit the crime of RECKLESSLY ENDANGERING ANOTHER PERSON, a misdemeanor of the second degree.

**COUNT TEN-** /"⁴_."

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did recklessly engage in conduct which placed or may have placed another person in danger of death or serious bodily injury, to-wit: Inspector Greg Strickland of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot fifteen rounds at or near the said victim with a Ruger 9mm semi-automatic gun occurring at the 1800 block of East 12tʰ Street and Downing Avene, East 12" - East 18`" Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania thereby the said **CHARLETON EARL JENNINGS** did commit the crime of RECKLESSLY ENDANGERING ANOTHER PERSON, a misdemeanor of the second degree.

AUNT ELEVEN: G-₁~"4

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did recklessly engage in conduct which placed or may have placed another person in danger of death or serious bodily injury, to-wit: Officer Les Fetterman of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot fifteen rounds at or near the said victim with a Ruger 9mm semi-automatic gun occurring at the 1800 block of East 12" Street and Downing Avene, East 12`ʰ - East 18ⁱʰ Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of RECKLESSLY ENDANGERING ANOTHER PERSON, a misdemeanor of the second degree.

COUNT TWELVE:

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did recklessly engage in conduct which placed or may have placed another person in danger of death or serious bodily injury, to-wit: Officer James Wasielewski of the Erie Police Department, in that the said CHARLETON EARL JENNINGS did shoot, fifteen rounds at or near the said victim with a Ruger 9mm semi-automatic gun occurring at the 1800 block of East 12°" Street and Downing Avene, East 12L" - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of RECKLESSLY ENDANGERING ANOTHER PERSON, a misdemeanor of the second degree.

1(COUNT THIRTEEN:

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did, while in the course of committing a theft, inflict serious bodily injury upon another and/or threatened another with or intentionally put him/her in fear of immediate serious bodily injury and/or committed or threatened immediately to commit any felony of the first or second degree, in that the said CHARLETON EARL JENNINGS did steal Officer Jay White's Ruger 9mm semi-automatic weapon by physical force after striking him about the head and face and shooting him occurring at the 1800 block of East 12`ʰ Street and Downing Avene, East 12ᵗʰ - East 18tʰ Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL ZENNINGS did commit the crime of ROBBERY, a felony of the first degree.

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did unlawfully take or exercise control over movable property of another, to-wit: a 9mm Ruger semi-automatic gun belonging to Officer Jay White of the Erie Police Department occurring at the 1800 block of East 12ᵗʰ Street and Downing Avene, East 12th - East 18r' Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania, with the intent to deprive said owner thereof and did thereby commit the crime of THEFT BY UNLAWFUL TAKING OR DISPOSITION, a felony of the third degree.

COUNT FLFTEEN:1

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said **CHARLETON EARL JENNINGS** did intentionally receive, retain or dispose of movable property, to-wit: a 9mm Ruger semi-automatic gun having belonging to Officer Jay White of the Erie Police Deaprtment occurring at the 1800 block of East 12th *Street and Downing* Avene, East 12°" - East 18rt' Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania, the said CHARLETON EARL JENNINGS knew or had reason to believe that said property was stolen and did thereby commit the crime of RECEIVING STOLEN PROPERTY, a felony of the third Legree.

COUNT SIXTEEN: 13

**AND THE DISTRICT** ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did possess a firearm or other weapon concealed upon his person with intent to employ it criminally and/or did possess any instrument of crime with intent to employ it criminally, to-wit: a 9mm Ruger semi-automatic gun, in that the said CHARLETON EARL JENNINGS did at the 1800 block of East 12ᵗʰ Street and Downing Avene, East 12°" - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania, and did possess officer Jay White's Ruger 9mm semi-automatic weapon concealed upon his person; thereby the said CHARLETON EARL JENNINGS did commit the crime of POSSESSING INSTRUMENTS OF CRIME, a misdemeanor of the first degree.

COUNT SEVENTEEN:. ~ ti

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did carry a firearm in any vehicle or concealed a firearm on or about his person, specifically, a Ruger 9mm semi-automatic handgun, 'occurring at the 1800 block of East 12=° Street and Downing Avene, East 12`ʰ - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, iennsylvania, not being his place of abode or fixed place of business without **a** license and not being exempted by the provisions of the Uniform Firearms Act; thereby the said **CHARLETON EARL** JENNINGS did commit the crime of FIREARMS NOT TO BE CARRIED WITHOUT A LICENSE, a felony of the third degree.

COUNT EIGHTEEN:.

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did unlawfully remove himself from official detention or did fail to return to official detention following temporary leave granted for a specific. purpose or limited period, to-wit: the said CHARLETON EARL JENNINGS did remove himself from the custody and/or detention of Officers Donadl Knepper and Jay White of the Erie Police Department occurring at the 1800 block of East **12r**" Street and Downing Avene, East 12`ʰ - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of ESCAPE, a felony of the **third** degree.

-MOUNT NINETEEN:

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid **in the** said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS with the *intent* of preventing a public servant from effecting a lawful arrest or discharging *any* other duty, did create a substantial risk of bodily injury to the public servant or anyone else, or employed means justifying or requiring substantial force to overcome the resistance,: in that the said CHARLETON EARL JENNINGS, with the intent of preventing Officer Jay White of the Erie Police Department, from effecting a lawful arrest and/or discharging any other duties did not comply with the officers instructions while attempting to take him **into** custody while the Aforesaid officer **was** attempting to make a lawful arrest and/or discharge a**lawful duties, occurring at** the 1800 block of East 12t **Street and Downing Avene**, East 12th - East 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the **said** CHARLETON EARL JENNINGS did commit the crime of RESISTING ARREST OR OTHER LAW ENFORCEMENT, a misdemeanor of the second degree.

COUNT TWENTY    t"` ~"`! *11*

AND THE DISTRICT ATTORNEY FURTHER CHARGES **that on** the day and year aforesaid in the said County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did *unlawfully and knowingly* possess a small amount of a certain controlled substance, to-wit: MARIJUANA, a Schedule I Substance, bccurring at the 1800 block of East 12 ⁴" Street and Downing Avene, East 12th - tast 18th Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania, the said CHARLETON EARL JENNINGS not then and there being 7.icensed or registered as required by the Acts of Assembly of the Commonwealth of Pennsylvania, *and* did thereby commit the crime of VIOLATION *CF* THE CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT, Possession of a Small Amount, a misdemeanor.

COUNT TWENTY--ONE..

AND THE DISTRICT ATTORNEY FURTHER CHARGES **that on the day** and year aforesaid in the said County of Erie **and** State of Pennsylvania, the said CHARLETON EARL JENNINGS did drive a motor vehicle upon any highway of this **Comonwealth** at a time when his operating privileges had been suspended, revoked or recalled, (DUI related) in that he did drive said vehicle upon the 1800 block of East 12 **Street and** Downing Avene, East 12`'' - East 18t ʰ Street vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit the crime of DRIVING WHILE OPERATING PRIVILEGE IS SUSPENDED OR REVOKED, a summary.

COUNT TWENTY-TWO:

AND THE DISTRICT ATTORNEY FURTHER CHARGES that on the day and year aforesaid in the **said** County of Erie and State of Pennsylvania, the said CHARLETON EARL JENNINGS did operate a vehicle without a head lamp in conformance with regulations of the department and/or did operate a vehicle equipped without a rear lighting system, including, *but not* limited to rear lamps, rear reflectors, stop lamps and license plate light in conformance with regulations of the department, in that the said CHARLETON EARL JENNINGS Uid operate a motor vehicle with no operational rear lighting system, occurring at the 1800 block of East 12" Street and Downing Avene, East 12th - Past 18" Street  vicinity of Conrail and CSX railroad tracks, Erie, Pennsylvania; thereby the said CHARLETON EARL JENNINGS did commit a violation of GENERAL LIGHTING REQUIREMENTS, a summary.

All of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania.

·( )   Notice is hereby given, per Pa. R.Crim.P.1127(B)(1), that this
        Information will be tried with Information


(XX) Notice is hereby given, per Pa. R.Crim.P.1127(B)(1), that your case will
        be tried together with all co-defendant(s) since you are alleged to have
        participated in the same act or transaction.

18 P.S.  901  (three counts)
18 P.S.  2702  (three counts)
18 P.S.  2705  (six counts)
18 P.S.  3701
j8 P.S.  **3921**
18 P.S.  3925
18 P.S.  903
 8 P.S.  6106
 8 P.S.  5121
 8 P.S.  51.04
35 P.S.  780-113 a 31
18 P.S.  1543 (b)
18 P.S.  4303

_____            _____
citation of Statute & Section          Attorney for Commonwealth

# PART 2
# DOCKET SHEETS AT ERIE COUNTY
# COMMON PLEAS COURT
# NO.2409 OF 2000

2000 - 02406 JENNINGS CHARLESON EARL

```
*******#****************** GENERAL INFORMATION ***************#*************
C_erk s Filing Date..    8/31/2000
        And Time         3:28
Case Type/Action         1   1  CRIMINAL                    COMPLAINT
Docket No. Fin Auth..    CR - 0000332 - 00
OTN                      H1232475
Final issuing Auth...    9    URBANIAK PAUL    ID# 06102
Municipality Code....    14    ERIE, CITY OF


Primary Address 1....   4950 KING ARTHUR DRIVE
        Address 2....
City, State, Zipcode.   ERIE, PA 16506

Alternate Address 1..
        Address 2..
City, State, Zipcode.    00000

Date of Birth           3/19/1976
Sex                     M (M=Male/F=Female/U=Unknown)
Race                    B   BLACK
Operator License No..   24951251                   State          PA
AEfiant 1               231  EPD                    State Police N
AEfiant 2               PA0250200

Date of Arrest          7/11/2000
Mag. Complaint Filed.   7/11/2000                   180 Day Date 1/07/2001
Prelim. A rrign. Date.  7/11/2000                   P/A Time.... 11:45
Date Waived to Court.   8/30/2000
Prelim. Hearing Date.   8/30/2000

District Attorney....
Defndt Atty/Type I...   1178 B CERASO TOM    ID# 00000 PRIVATELY RETAIN
Defndt Atty/Type 2...

Date Bail Set           0/00/0000
Bail Code Desc          STBL   STRAIGHT BAIL
Surety
Bail Set Amount          250,000.00
Committed Date          7/11/2000
In Jail / Fugitive...   Y (Y=In Jail/ N=Not In Jail/ F=Fugitive)
FBI Id Number
State Id Number         0000000000
Auto Registration....                               State
Public Comments         1800 BLK. DOWNI
                        302
Reference Number
Court Stenographer...

Feight                                Weight
Eye Color                             Hair Color
physical Features
Init. Issuing Auth...   00000
Docket No. Init Auth.    - 0000000 -

Pre-Sentence Invest..   A       PRE-SENTENCE-STATE
```

ZO'd      6tib9 TSb PT8          Al iJ 10 Ia  sla A±Nll00 31d3      8S:2i  £00Z-b i-MM

CCS600    Erie **County** Clerk or Courts    Page 2
..12939Case:1:02-cv-00210-MBC   Document 84-2   Filed 11/11/2005   Page 12 of 110
Case Print

X000 = 02406 JENNINGS CHARLETON EARL

**Trial Corrunenced** Date.    3/16/2001
'Trial Judge           129    CONNELLY SHAD    ID# 19709
Sentence/ARD Date....    5/04/2001
E fect. Date of Snt..    7/11/2000
• perior Court #

F led/Reopened Description      Disposition      Disposition Code
   8/31/2000    INITIAL FILING     3/24/2001     F    JURY TRIAL


\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*~\*\*\*\*\* ALIAS OR CO-DEFENDANT INFORMATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
           Alias or Co-Defendant Name      Type      Case #


.\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* CHARGE INFORMATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
    Date     Chrg   Cnt   Section     Sub    Grd Desc

    7/07/00 A     001 CC901      A     F1   ATTEMPT CRIMINAL HOMICIDE
• sposition Date            5/04/2001
• sposition *Description. NOT GUILTY*                 HDCT
T ial            301 JURY

    7/07/00 B     002 CC901      A     F1   ATTEMPT CRIMINAL HOMICIDE
• sposition Date            5/04/2001
• sposition Description. NOT GUILTY             HDCT
T ial            301 JURY

    7/07/00 C     003 CC901      A     F1   ATTEMPT CRIMINAL HOMICIDE
• sposition Date            5/04/2001
• sposition Description. GUILTY             HDCT
T ial            301 JURY
• icon            501 DIAGNOSTIC CLASSIFICATION CENTER
F nes and Costs         522 COSTS-TOTAL AMOUNT ONLY...$

    7/07/00 D     004 CC2702     Al     F1   AGGRAVATED ASSAULT
• sposition Date            5/04/2001
• **sposition Description. GUILTY**             HDCT
**T ial** ▮▭▭▭▭▭▭▮**01 JURY**

    7/07/00 E     005 CC2702     Al     F1   AGGRAVATED ASSAULT
Disposition Date            5/04/2001
**Disposition** Description. NOT GUILTY           HHDCT
   ial ▮▭▭▭▭▭▭▮**01 JURY**

    7/07/00 F     006 CC2702     A1     F1   AGGRAVATED ASSAULT
ᶦisposition Date            5/04/2001
ᶦisposition Description. GUILTY            HDCT
ᶦrial            301 JURY

    7/07/00 G     007 CC2705        M2   RECKLESSLY ENDANGERING ANOTHER PERS
ᴵisposition Date            5/04/2001
ᶦisposition Description. WITHDRAWN MERGED WITH CT 4     HDCT
ᶦrial            301 JURY
erdict            312 GUILTY

    7/07/00 H     008 CC2705        M2   RECKLESSLY ENDANGERING ANOTHER PERS
ⱼsposition Date            5/04/2001

CS600
Erie County Clerk of Courts
Page          3
1-293903342003
Case 1:02-cv-00210-MBC   Document 84-2   Filed 11/11/2005   Page 13 of 110
Case Print

2 00 -,  02406 JENNINGS CHARLETON EARL

• sposition Description. WITHDRAWN MERGED WITH CT 5                    HDCT
T ial                      301 JURY
V rdict                    311 NOT GUILTY

| 7/07/OO I      009 CC2705          M2   RECKLESSLY ENDANGERING ANOTHER PERS
• sposition Date      ▮▮▮▮▮5/04/2001▮
• sposition Description. WITHDRAWN MERGES WITH CT 6                    HHDCT
T ial                      301 JURY
V rdict                    311 NOT GUILTY

   7/07/00 J      010 CC2705          M2   RECKLESSLY ENDANGERING ANOTHER PERS
• sposition bate           5/04/2001
• sposition Description. JUDGEMENT OF ACQUITAL                         HDCT
T ial                      301 JURY
V rdict                    311 NOT GUILTY

   7/07/00 K      011 CC2705          M2   RECKLESSLY ENDANGERING ANOTHER PERS
• sposition Date           5/04/2001
• sposition Description. GUILTY                                        HDCT
T ial                      301 JURY
V rdict                    311 NOT GUILTY

   7/07/00 L      012 CC2705          M2   RECKLESSLY ENDANGERING ANOTHER PERS
• sposition Date      ▮▮▮▮▮5/04/2001▮
• sposition Description. WITHDRAWN BY COMMONWEALTH                     HDCT
T ial                      301 JURY
V rdict                    311 NOT GUILTY

   7/07/00 M      013 CC3701      Al     Fl   ROBBERY
• sposition Date           5/04/2001
• sposition Description. GUILTY                                        HDCT
T ial                      301 JURY
V rdict                    312 GUILTY
• 'son                     501 DIAGNOSTIC CLASSIFICATION CENTER
F nee and Costs            522 COSTS-TOTAL AMOUNT ONLY... $

   7/07/00 N      014 CC3921      A      F3   THEFT ]BY UNLAW TAKING-MOVABLE PROP
 sposition Date            5/04/2001
 sposition Description. GUILTY                                         HDCT
 ial                       301 JURY
 rdict                     312 GUILTY

   7/07/00 0      015 CC3925      A      F3   RECEIVING STOLEN PROPERTY
 isposition Date           5/04/2001
 isposition Description. WITHDRAWN MERGES WITH CT 14                   HDCT
 rial                      301 JURY
 erdict                    311 NOT GUILTY

   7/07/00 P      016 CC907       B      M1   POSSESSION OF WEAPON
 isposition Date           5/04/2001
 lsposition Description. GUILTY                                        HDCT
 rial                      301 JURY
 erdict                    312 GUILTY

   7/07/00 Q      017 CC6106      Al     F3   FIREARMS NOT TO BE CARRIED W/O LICE
 isposition Date           5/04/2001
 isposition.Description. GUILTY                                        HHDCT

2000 - 02406 JENNINGS CHARLETON EARL

Trial                            301 JURY
 -rdict                          312 GUILTY

   7/07/00 R    000 CC6105    A          PERSON NOT TO POSSESS, USE, ETC. FI
Disposition Date              5/04/2001
Disposition Description. NOLLE PROSSED                                    WD
Trial                         301 JURY
Verdict                       311 NOT GUILTY

   7/07/00 S    018 CC5121    A      F3   ESCAPE
Disposition Date              5/04/2001
Disposition Description. GUILTY                                           HDCT
Trial                         301 JURY
**verdict**    ▮▭▭▭▭▮312 GUILTY
Prison                        501 DIAGNOSTIC CLASSIFICATION CENTER

   7/07/00 T    019 CC5104    M2   RESIST ARREST/OTHER LAW ENFORCE
Disposition Date              5/04/2001
Disposition Description. GUILTY                                           HDCT
Trial                         301 JURY
Vaxdict                       311 NOT GUILTY

   7/07/00 U    020 CS780-113 A31    M   POSS OF MARIJUANA
Disposition Date              5/04/2001
**Disposition** Description. NOT GUILTY                                   HDCT
**Trial**    ▮▭▭▭▭▮ 301 JURY
Verdict                       311 NOT GUILTY

   7/07/00 V    021 VC1543    B      S   DRG LIC SUS/REV PURS TO SEC 3731/15
Disposition **Date**    ▮▭▭▭5/04/200▮
Disposition Description. GUILTY                                           HDCT
Trial                         301 JURY
Verdict                       **312 GUILTY**

   7/07/00 W    022 VC4303    B      S   NO REAR LIGHTS
Disposition Date              5/04/2001
Disposition Description. GUILTY                                           HDCT
Trial                         301 JURY
V,ardict                      312 GUILTY


*************************** **DOCKET** ENTRY INFORMATION **********************'~~`***
Case Type..: CRIMINAL                Case Action..: COMPLAINT

                         **FIRST ENTRY - - - -**
   7/13/00 **ORDER FOR MEDICAL RECORDS FROM** ST VINCENT'S HOSPITAL PERTAINING TO
        TREATMENT OF JAY WHITE ON OR ABOUT 7/7/00 S/JUDGE SHAD CONNELLY

   7/13/00 ~~ORDER FOR MEDICAL RECORDS FROM EMERGICARE PERTAINING TO TREATMENT~~
        OF JAY WHITE ON OR ABOUT 7/7/00 S/JUDGE SHAD CONNELLY

   7/13/00 ~~ORDER FOR MEDICAL RECORDS FROM ST VINCENTS HOSP PERTAINING TO TEE~~
        **TREATMENT OF LES FETTERMAN ON OR** ABOUT 7/7/00 S/JUDGE SHAD CONNELLS

   7/13/00 ~~ORDER FOR **MEDICAL RECORDS** FROM EMERGICARE PERTAINING TO TREATMENT~~
        OF LES FETTERMAN ON OR ABOUT 7/7/00    S/JUDGE SHAD CONNELLY
        -------------------------------------------------------------------

# PART 3
# TESTIMONY OF DONALD KNEPPER
# COMMON PLEAS COURT
# NO.2409 OF 2000

# COPY

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

     VS                   : OF ERIE COUNTY, PENNSYLVANIA

CHARLETON JENNINGS          CRIMINAL DIVISION

                          N . 2406 OF 2000

## JURY TRIAL

(DAY 1)

Proceedings held before the Honofbble '

Shad Connelly, in Courtroom A, Erie County

Courthouse, Erie, Pennsylvania, on Tuesday,

March 20, 2001, commencing at 9:35 a.m.

**APPEARANCES:**

<u>Bradley H. Foulk, District Attorney,</u> and <u>Chad Vilushis,</u>
<u>Assistant District Attorney</u> appearing on behalf of the
Commonwealth.

<u>Thomas Ceraso, Attorney at Law,</u> and <u>James Ecker, Attorney at</u>
<u>Law,</u> appearing on behalf of the Defendant.

     Andrea C. Muscarella -- Official Court Reporter

2

1                          **I.N D E X**

2

3      Witnesses:

4                          Direct   Cross   Redirect   Recross

5      Donald Knepper            51      95       125        132
       Kathy Brown              136
6      Jay White                146     201       249        252

7

8      Exhibits:

9                              Identified   Admitted

10     1 (marijuana)                78          79
       2 (photo)                    88          90
11     3 (photo)                    94          94
       4 (dispatch narrative)      138
12     5 (taped transmission)      145
       6 (property issue form)     188
13     7 (nylon duty belt)         189
       8 (gun)                     190

14

15     Courtroom A (aerial drawing)   58

16

17

18

19

20

21

22

23

24

25

1                          **DONALD KNEPPER,**

2    having been duly sworn, was examined and testified as

3    follows:

4

5                      <u>**DIRECT EXAMINATION**</u>

6

7    BY MR. FOULK:

8    •        Good morning, Officer Knepper?

9    A        Morning.

10   •        Can you tell the ladies and gentlemen your full

11   name, please?

12   A        Donald E. Knepper.

13   •        Where are you employed, officer Knepper?

14   A        Erie Police Department.

15   •        How long have you been so employed?

16   A        Twenty years.

17   •        What is your present rank, sir?

18   A        Patrolman.

19   •        Would that have been the same in July of last year?

20   A        Yes, it is.

21   •        Officer Knepper, I want to ask you quite a few

22   questions about an incident which took place on July 7th of

23   last year. If I ask you a question and you do not

24   understand or I confuse you in any way, I want you to let me

25   know and I'll rephrase the question or clarify it for you,

1  fair enough?

2  A        Yes.

3  •        Now, Officer Knepper, were you working on July 7th

4  of last year?

5  A        Yes, I was.

6  •        And what shift were you working?

7  A        Third shift, which starts at ten-thirty and ends

8  at    ten-thirty at night and ends at six-thirty in the

9  morning.

10  •        And were you in full uniform that evening?

11  A        Yes.

12  •        Were you in a marked vehicle or unmarked vehicle?

13  A        A marked cruiser.

14  •        Did you have a partner that particular evening?

15  A        No, I worked by myself.

16  •        How long had you been in the one-man car prior to

17  July 7th of last year?

18  A        Do you mean throughout my career or

19  •        Let's say in the last five years?

20  A        Most of the time, but it depends on how the

21  scheduling is done by the Sergeant. Sometimes I'd have a

22  partner, sometimes I wouldn't.

23  Q        Fair enough.   Were you accustomed to working one

24  particular area of Erie?

25  A        No, usually I would be assigned to fill in for when

53

1    another officer was off or on vacation, so I'd be anywhere

2    throughout the whole city.

3    •        Before we begin with this particular incident, let

4    me ask you this, in July of last year, did the Erie Bureau

5    of Police have in place any form of a procedure whereby a

6    one-man car would effectuate a traffic stop, would you have

7    backup, would it be an understood thing that other officers

8    would respond, how would that work?

9    A        There's no written policy that I know of that backup

10    would be sent, it's the custom of all the patrol officers to

11    backup one another on any traffic stop at any time of day.

12    •        Do you have to request a backup or do guys and

13    ladies automatically back each other?

14    A        Most of the time it's automatic, but occasionally

15    you might want to ask for backup.

16    •        In this particular area where this incident took

17    place, does it differ in any way from other areas of the

18    city as far as backup is concerned? Would you get backup in

19    Frontier, backup in Glenwood, backup on the eastside?

20    A        Backup no matter where the traffic stop is made.

21    Q        So there are no particular areas of the city as far

22    as you know or at least in July of 2000 where backup is

23    required?

24    A        I'm sorry, say that again, please?

25    •        In July of 2000, were there any areas of the city --

1   or more specifically, the area of 12th and Downing, was

2   backup required in that particular area or was it merely a

3   courtesy or a safety consideration?

4   A      It's always a safety consideration to go and backup

5   somebody who is on a traffic stop because anything can and

6   does happen during routine traffic stops.

7   •      What time was your shift scheduled to conclude

8   during the early morning hours of July 7th?

9   A      Six-thirty.

10  •      Six-thirty a.m.?

11  A      Right.

12  •      Did there come a point in time, Officer Knepper,

13, during the early morning hours of July 7th when you had any

14  contact with Wesleyville PD?

15  A      Yes.

16  •      And about when would that have occurred?

17  A      I'm going to guess, probably, maybe around two

18  o'clock in the morning.

19  Q      If you're approximating times, let us know from here

20  on out, okay. You just said approximately two, and that's

21  fine, if you have to approximate or if you give detailed

22' times, let us know that too, okay?

23  A      Okay.

24  •      What was the nature of the conversation that you had

25  with Wesleyville PD at about 2 a.m. on the 7th?

55

1   A     Wesleyville officer requested to meet an Erie

2  officer at Bird Drive and Buffalo Road.

3   •     Is that still the city?

4   A     It's the border between Erie and Wesleyville.

5   •     Okay.  Go ahead.

6   A     So I went to meet the officer to see what he wanted.

7   •     Do you recall the officer's name from Wesleyville?

8   A     No, I don't. And he proceeded to tell me that he

9  just saw a black male driving a car, and he knew for sure

10  that this particular individual did not have a license or

11  that it was suspended.

12   •     Did he tell you the make of the vehicle?

13   A     The make of the vehicle, I don't believe he did.

14   •     Did he give a description of it at all?

15   A     He said larger, darker car, and then he also said

16  that the individual was at this moment pumping gas at the

17  Sunoco station at Buffalo Road and McClelland.

18   •     Would that be Erie?

19   A     That would be Erie.

20   •     What did you do in response to that information, if

21  anything?

22   A     I went back from Buffalo Road and Bird where I was

23  talking to the Wesleyville officer, I went back to the

24  station at McClelland and Buffalo Road and the individual

25  that he had described to me was not there.

1    •    Had you seen an individual matching that description

2    that Wesleyville PD provided when you were eastbound to meet

3    Wesleyville PD?

4    A    Yes, that is correct. I had passed that gas station

5    in order to go to meet the Wesleyville guy, and I had seen

6    the person that he was describing pumping gas at that Sunoco

7    station.

8    •    Let me ask you this, Officer Knepper, did the

9    conversation that you had with the Wesleyville PD and

10   whoever the officer may have been have anything to do with

11   what we are about to discuss here this morning?

12   A    Not at all.

13   •    Anything at all?

14   A    Not at all, not a thing.

15   •    Did the car in any way look similar to or match the

16   description of the car that Mr. Jennings was operating when

17   you stopped him that night?

18   A    No, not at all.

19   •    Did the driver in any way match the description of

20   the Wesleyville police officers?

21   A    No.

22   •    Did there come a point in time that evening, sir, in

23   the morning, when you effectuated or attempted to effectuate

24   a traffic stop roughly around 2:20 a.m.?

25   A    Yes.

57

Q      Can you tell the ladies and gentlemen of the jury
about what time it was, and tell us the type of vehicle and
what you observed?

A      It was about twenty after two in the morning, it was
shortly after I had left the Wesleyville officer, I was
coming down Downing Avenue, I was going north towards 12th
Street from Buffalo Road. I got to about 18th, I had --
this is the first time that I became aware of a car that was
in front of me, maybe twenty, thirty yards or so. Its
taillights were out. I could see that its headlights were
working, but the taillights were out. So I just followed
the car for a little while. There's two sets of tracks that
we went over.

Q      Okay.  Let me stop you there. Were you able to see
the plate on the car?

A      Yes.

Q      At that point in time, did you do anything with the
plate number, did you request that it be run for any
particular reason?

A      Yes, I radioed in to the headquarters to run this
particular plate that I read off the car.

Q      Okay.  And at the time that you asked for them to
run the plate, were you attempting to pull the car over at
that point in time?

A      No.

58

1   Q      And what was your purpose in running the plate?

2   A      To find out who the owner was.

3   Q      And can you describe the vehicle for us?

4   A      Yes, it was a green Mazda, it's a small car, nothing

5   particular, noteworthy about it.

6                  MR. FOULK:  Your Honor, with the Court's

7           permission, I'm going to ask Officer Knepper to step

8           down so we can have him work off what I have marked

9           as Court A.

10                  THE COURT:  All right.  Keep your voice

11          up, Officer.

12                  OFFICER KNEPPER:  Yes, sir.

13                  MR. FOULK:  Counsel for Mr. Jennings has

14          previously seen this particular exhibit, is that

15          correct, Mr. Ceraso?

16                  MR. CERASO:  Pardon me?

17                  MR. FOULK:  You have seen this exhibit?

18                  MR. CERASO: I have, and I have no

19          objection to its admission into evidence, Your

20          Honor.

21                  THE COURT:  All right.

22                  MR. FOULK:  Thank you.

23  BY MR. FOULK:

24  Q      Officer Knepper, can you tell me what Courtroom

25  Exhibit A depicts, please?

1   A       This area is Buffalo Road to the south, this is

2   Downing Avenue that runs north and south, and this is 12th

3   Street, which runs east and west. There is two sets of

    tracks that bisects Downing Avenue.   This area in here is

5   like a ball field, playground area, these are woods, wooded

6   area right in through here, and on this side is a park.

7   Roger Young pool is over here. This **is kind** of a wooded

8   area, a lot of weeds, a lot of underbrush, undergrowth, same

9   thing over here. This area right down in through here is a

10  truck and transfer station, ABF. This building right here

11  is Penn Beer Company, and this over here is Penelec

12  transformer station.

13  Q       Would you agree or disagree that Courtroom Exhibit A

14  accurately -- obviously it's an aerial view, but accurately

15  depicts this location on July 7 of 2000?.

16  A       Yes.

17                  MR. CERASO:   We are willing to stipulate

18          to that, Your Honor.

19                  THE COURT:   All right.

20                  MR. FOULK:   Thank you, Mr. Ceraso.

21  BY MR. FOULK:

22  Q       If you could, with the pointer, can you show the

23  jury approximately where it was that you ran the plate of

24  the vehicle Mr. Jennings was operating at that point?

25  A       Okay.   Coming north on Downing Avenue, it was before

1    we got to the first set of tracks that I actually called the

2    plate in to be run.

3    Q        How fast were you going northbound on that?

4    A        Twenty, twenty-five miles an hour.

5    Q        Well within the speed limit, **sir?**

6    A        Oh, absolutely.

7    Q        What was your intention when you first saw the

8    vehicle northbound on Downing?

9    A        Well, I was going to follow him and watch him to see

10   if his taillights would come on as he came over the tracks.

11   Q        Why were you going to do that, officer Knepper?

12            Well, maybe just by bouncing or something, maybe

13   there was a loose wire or something, maybe they would come

14   back on.

15   Q        Okay.  How far behind the vehicle operated by what

16   we now know as Mr. Jennings were you as that vehicle crossed

17   the tracks?

18   A        Approximately forty to fifty yards.

19   Q        At this point in time, what were you thinking if

20   anything?  Was this a big deal, a minor type thing, what was

21   it?

22   A        It was a very minor thing. If the lights didn't

23   come on by crossing either sets of the tracks, I was going

24   to pull him over, tell him that his back lights weren't

25   working, and have him get them fixed at some time as soon as

1   possible.

2   •       Okay.   During the week prior to this incident, how

3   many traffic stops did you make?

A       None.

5   •       Not to embarrass you, but during the month prior,

6   how many traffic stops did you make?

7   A       None.

8   •       Why were you going to make a traffic stop in this

9   particular case?

10  A       In this particular case, it was kind of slow that

11  particular work shift, nobody really knows that their own

12  taillights are out unless somebody points it out to them, so

13  I was just going to pull him over and tell him his lights

14  were out and that would be it.

15  •       The lights don't go off after he hits the first set

16  of tracks, the south set, right?

17  A       Correct.

18  •       What is your intention between the south set of

19  tracks and the north set of tracks?

20  A       Between here and here?

21  •       Yes, sir?

22  A       I was still going to follow him and see how    see

23  what happened when he went over this set of tracts.

24  •       At this point in time, had you activated your

25  lights?

62

1    A        No.

2    •        Had you given a siren of any type?

3    A        No.

4    •        Tell us what happened as you proceeded northbound

5    over the north set of tracks?

6    A        Okay.   His -- the brake lights both came on as he

7    went over both sets of tracks, and after his foot come off

8    the brake, the lights blow out again, so there's still no

9    taillights.   After this set of tracks is when I turned my

10   lights on to pull Jennings over.

11   •        Okay.   That would be your overhead rack?

12   A        The overhead roof rack, yes.

13   •        Okay.   And then we went, continued down to 12th

14   Street, although Jennings had slowed down, he still didn't

15   stop, actually made the turn --

16   Q        At this point in time, had you activated your siren

17   or horn yet?

18   A        No.

19   •        As he started?

20   A        As he started to make the turn on to 12th Street to

21   go east, that's when I hit the air horn, gave him two blasts

22   of the air horn.

23   •        No siren yet?

24   A        No siren.

25   •        Why did you hit the air horn?

63

1    A        Just an option that we have, you know, just reach

2    over the cruiser and just punch the button.

3    •        Is it uncommon for you to have your lights on trying

4    to pull someone over and they simply don't notice you,  is

5    that uncommon?

6    A        No, it's not.

7    •        Now, let me ask you this, as you're northbound on

8    Downing from 18th to 12th, were you able to tell how many

9    occupants there were in this vehicle?

10   A        I could only see one person in the car.

11   •        Were you able to tell if it was a man or a woman?

12   A        No.

13   •        Were you able to tell if it was a white person, a

14   black person, Hispanic person?

15   A        No.

16   •        As you turned right on to 12th, headed eastbound,

17   what did the operator of that vehicle do?

18   A        Okay.  As he started to make his turn to come across

19   12th Street like this, that's when I hit the air horn and

20   gave him a couple blasts. And then he started to slow down

21   and he pulled over right about here with myself right behind

22   him.

23   •        At this point in time, had you made any radio

24   transmissions as to what you were doing?

25   A        Yes, I radioed in that I would be pulling this car

1   over at 12th and Downing.

2   •       Did you say why you were pulling it over?

3   A       I don't know if -- I don't recall if I said that I

4   was pulling it over for taillights or not.

5   •       At the time that the vehicle pulled over to the

6   north side of 12th -- or the south side of 12th Street, what

7   was your intent at that point in time?

8   A       My intention at that point was still to warn the

9   driver that his lights were out and to get them fixed.

10  •       Were you going to give him a citation?

11  A       Not at that point.

12  •       At that point in time, did you have any idea who the

13  operator of that vehicle was?

14  A       No.

15  •       Once the operator pulled over, what did you do next?

16  A       Well, I had radioed in that we had stopped and that

17  I was going to get out of the car. I got out of my cruiser

18  and approached the driver, asked him for his license

19  registration, and insurance information.

20  •       Were you in any way apprehensive about this

21  particular stop or were you calm, how were you?

22  A       I was -- yeah, very calm, at ease, nothing seemed to

23  be out of the ordinary at this point.

24  •       What was your general mood that night, officer

25  Knepper?

65

A       I was -- pretty good mood. I don't know    what do

2   you want me to -- how --

3   •       Were you in a good mood?

4   A       I.was in a good mood.

5   •       All right.   When you approached the vehicle, what

6   side did you approach on?

7   A       I approached on the driver's side.

•       Was there anything unusual about the manner in which

9   the driver addressed you or how he addressed you through the

10  vehicle?

11          Yes.   The driver's side windows were up, both the

12  back and the front, and I just kind of rapped on the

13  driver's window, informed him to roll his window down so I

14  could talk to him.

15  •       Was he seated fully upright or was he reclined at

16  all?

17  A       When I tapped on the window, he had set the seat all

18  the way back and rolled down the back window and talked.

19  Q       When you say all the way back, are you talking about

20  the back rest of the seat?

21  A       The back of the seat itself as far as it would go

22  backwards, that's how he did it.

23  •       How were you talking to the driver of this vehicle?

24  A       Through the back window.

25  •       The back window?

66

1    A       The back window.

2    Q       Do you recall whether or not there was a sun roof or

a moon roof on this vehicle?

4    A       There was.

5    Q       Was it opened or closed?

6    A       It was closed as I recall.

7    Q       What, if anything, did you say to the driver of the

8    vehicle?

9    A       When I asked him for his license, his registration,

10   and the insurance, he asked me why I pulled him over. And I

11   told him that once he gave me the cards that I requested,

12   that I would show him why I pulled him over.

13   Q       Why didn't you tell him at that point in time why

14   you pulled him over?

15   A       Well, I wanted to get the license and registration,

16   the insurance information first to make sure that we did

17   have it.

18   Q       Did you know the person that was operating this

19   vehicle?

20   A       No.

21   Q       Is the person that was operating this vehicle on

22   July 7th of 2000 present in the courtroom this morning?

23                    MR. CERASO:  We will stipulate

24           identification, Your Honor.

25                    MR. FOULK:  Thank you, Mr. Ceraso.

67

BY MR. FOULK:

•        Did Mr. -- or did the operator of the vehicle
produce registration and insurance form?

A        He gave me an insurance card, a title that he had
dug out of the glove box, and no license.

•        What did the title say with reference to the owner
of the vehicle?

A        The owner of the car was listed as Cassandra Howard.

•        How about the insurance forms?

A        The insurance forms also were for that particular
car, to Cassandra Howard.

•        Were they both current?

A        Yes.

•        Do you remember if they had a current inspection
sticker on the vehicle?

A        I really don't remember.

•        Is that something you would look for?

A        I would probably, yes, take a look at the windshield
and see if it was, but I don't remember if I did that or
not.

•        If I were to tell you it was a current inspection
sticker, you wouldn't necessarily disagree, would you?

A        No.

•        Did the defendant, Mr. Jennings, provide you with a
name?

68

1   A      Yes.

2   •      Who did he say he was?

3   A      He gave me the name of Damon Willcott.

4   •      Did you have any reason at that point in time. to

5   disagree with him?

6   A      No.

    Q      Did he give you a DOB, date of birth?

8          Yes, he did.

9   Q      Did he give you any other vital information?

10,        That's all the information I asked for in regards to

11  the license.

12. Q      Did you ask him for an address where he lived?

13  A      I don't recall that I did.

14  •      At this point in time, what was your intention with

15  regard to the operator of that vehicle?

16  A      Well, since he couldn't produce a license for me, I

17  was going to run the information, the name and the date of

18  birth through NCIC to see if he did, in fact, have a license

19  and if the license was okay.

20  •      When you initially approached the vehicle, did you

21  have a flashlight?

22  A      Yes.

23  •      Did you look inside the vehicle at all?

24  A      I think I gave a cursory look at the back seat, but

25  other than that, no.

69

1   •    After you were supplied with a phony name and

2   registration and insurance form, what did you do?

3   A    I got Jennings out of the car and I brought him to

4   the rear of his car. And I pointed out to him, I said,

5   look, do you see your headlights are on, he said yes. I

6   said, but your taillights aren't. He says oh, and he looked

7   a little relieved.

8   •    At this point in time, was Officer White with you?

9   A    No.

10  •    What did you do with Mr. Jennings or the person we

11  know to be Mr. Jennings now?

12  A    I told him to get back into his car, that I was

13  going to find out if his license was any good or not and

14  then I'd get back to him.

15  •    Did he get back in the car?

16  A    Yes.

17  •    Did you get back in your car?

18  A    Yes.

19  •    Did you get on the radio?

20  A    Yes.

21  •    What did you do?

22  A    I gave the name and the date of birth that was given

23  to me to be run for a license check.

24  •    How long did it take to run that license check?

25  A    I'm going to guess, approximately a minute, minute

1    and a half.

2    •       What were you advised?

3    A       I'm sorry?

4    •       What were you advised by the station?

5    A       They told me that that particular person's license

6    had been suspended.

7    •       Was the registration good?

8    A       Registration was good.

9    •       Insurance good?

10   A       Yes.

11   •       What was your intention when you found out the

12   license wasn't any good?

13   A       Well, at that point, I was going to write him two

14   tickets that -- I decided I was going to write him two

15   tickets, one for not having the working lights and two for

16   driving under a suspended license.

17   •       That's what you decided before you got out of your

18   car?

19   A       Yes.

20   •       At that point in time, had Officer White arrived?

21   A       Yes.

22   •       And where was he?

23   A       He was to my left, like I was in the right -- the

24   very far curb lane right behind Jennings, and then Jay come

25   up next to me in the middle lane, middle of the three lanes.

71

1    •    Middle of the three lanes?

2    A    Right.

3    •    When you got out of your car, where did you

approach, back towards the driver's side?

5    A    Yes.

6    •    And what did you tell -- strike that.

7    As you approached the driver's side, what did Officer White

8    do?

9    A    Well, I asked officer White if he had any traffic

10   citations because I don't carry them. And he said that yes,

11   he did, and I asked him for two.

12   •    Let me back up. How come you don't carry any

13   traffic citations?

14   A    It's a personal thing with me that I believe the

15   police department has a lot of motorcycles and bicycles and

16   stuff to do traffic work, and that's not my primary function

17   is to pull over cars just to write tickets.

18   •    I was just going to say, you're not a big traffic

19   citation guy, are you?

20   A    Not at all.

21   •    Okay.  When you went over to the driver's side of

22   the car, Officer White went to the opposite side?

23   A    Yes.

24   Q    As you were standing there talking to Mr. Jennings

25   or what -- you believed him to be who at that point?

1    A        Damon Willcott is who I thought I was talking to.

2    •        You told him what again, what did you tell

3    Mr. Willcott or Mr. Jennings?

4    A        The second time that I approached the car?

5    •        Yes.

6    A        I asked him why his license was suspended.

7    •        And did he say anything to you?

8    A        He said oh, yeah, I got a couple of citations for

9    the noise violation.

10   •        Okay.  Can you be suspended in the Commonwealth of

11   Pennsylvania for noise violations?

12   A        No, only for Vehicle Code violations.

13   •        What, if anything, did you say to Jennings when you

14   said he was suspended because of making too much noise?

15   A        I said, are you sure because the state doesn't

16   suspend licenses for that.

17   •        Where is Jay White?

18   A        Jay White is on the passenger's side, the right side

19   of the car at this time.

20   Q        Do you know if the window was up or down?

21   A        The right side window, I don't know.

22   •        Do you know if the sun roof or moon roof was opened

23   or closed?

24   A        It was closed.

25   •        What did you tell Mr. Jennings at that point in

73

1    time?

2    A      I was still talking to him about why his license --

3    or ask him for a reason why his license was suspended. And

4    that's about all the further that the conversation got to

5    before Jay White got my attention.

6    •      How did Officer White get your attention?

7    A      By tapping on the roof of the car.

8    •      Did Jay have a flashlight, if you know?

9    A      Yes.

10   •      Did you see him scanning the vehicle with his

11   flashlight?

12   A      Yes.

13   •      What, if anything, did Officer White say to you or

14   did he communicate in any way to you as to something that

15   may or may not have been wrong inside the car?

16   A      Yes, he had indicated to me that on the floor,

17   driver's side floor, there was a pack of marijuana that he

18   had seen from the driver's side -- or from the passenger's

19   side.

20   •      Did he say that or did he give you --

21   A      I think he --

22   •      -- body language or how did he do that?

23   A      I think he gave me just a motion, like tokin' on a

24   joint or something like that.

25   •      I don't want you to guess. If you have a specific

1   recollection, that's fine, but don't guess.  Do you remember

2   how he communicated it to you?

3   A        Exactly, no, but it was a gesture of some type.

4   •        All right.  What did you do after Officer White

5   gestured to you?

6   A        Well, then I looked, I got my flashlight and I got a

7   little pocket here that I keep my flashlight in.  I pulled

8   my flashlight out, and I looked underneath on the floor

9   board of the driver -- of the driver's side.

10  •        Had you looked in that area before?

11  A        No, not closely.

12  •        At any time did you see Officer White throw anything

13  into that vehicle?

14  A        No.

15  Q        At any time up until this point, did Officer White

16  indicate to you that he knew the defendant in this case?

17           No.

18  Q        At that point in time, was Officer White's dog in or

19  out of the car?

20  A        In the car.

21  •        When you saw the marijuana, what, if anything, did

22  you say to Mr. Jennings?

23  A        Well, I looked down. And I saw it between his feet

24  and I thought, what the hell is that between your feet. And

25  he just kind of looked down and he reached down with his

75

1  left hand, picked it up, and handed it out the back window

2  to me.

3  •       Did he say anything to you at all about the

4  marijuana, it's mine, I'm sorry, I don't know where that

5  came from, anything like that at all?

6  A       No.

7  •       Once Mr. Jennings handed you the bag of suspected

8  marijuana, based upon your experience and training, did you

9  think that that was, in fact, marijuana underneath there?

10  A       Yes.

11  •       When he handed you the bag, what, if anything, did

12  you say to him?

13  A       I didn't say anything to him at that point, I told

14  Officer White that I wanted to get him out of the car.

15  •       And did you indicate to Mr. Jennings or Mr. Willcott

16  at the time that you wanted him out of the car?

17  A       Yes, after Jay acknowledged what I had told him,

18  then I went up to the driver's side again and I told the

19  driver, I said, "I'm going to get you out of the car and I'm

20  going to handcuff you, and depending on what else, if

21  anything, that I find in your car, you may walk away from

22  here with just two citations."

23  Q       Did you -- there was a comment earlier, did you

24  include that in your report that you told the driver that

25  even after you discovered the marijuana, that you were just

76

1  going to issue a couple citations and let him go?

2  A      If I found nothing else in the car.

3  •      Okay.  Did you include that in your report?

4  A      I believe I did.

5  •      I'm going to show you, it would be page 64 of the

6  total complete police report.

7                      MR. CERASO: The last one?

8                      MR. FOULK: Yes.

9                      MR. CERASO: Okay.

10  BY MR. FOULK:

11  •      There's some indication you didn't put that in your

12  report.  I'm going to show you page 63 to refresh your

13  recollection, top paragraph, what's it say?

14  A      Do you want me to read the whole top paragraph?

15                      MR. CERASO:  Your Honor, if I might, I

16              would object to this on the basis that he's

17              indicated no problem in terms of recollection. as to

18              what occurred.  There's been no assertion of recent

19              fabrication, and I don't believe that it's proper

20              for him to read his report.

21                      MR. FOULK: Your Honor, I believe in

22              opening, Mr. Ceraso said that was never included in

23              the report.  I believe Officer Knepper in response

24              to my question as to whether or not he included it

25              in the report, he said I believe that I did. I'm

1          showing him his report to refresh his recollection

2          as to whether or not that particular item was

3          included in his report.

4                    THE COURT:   The objection is overruled.

5'         Proceed.

6                    OFFICER KNEPPER:   I advised the driver

7          that I was going to get him out of the car and

8          handcuff him.   I also told him that if I didn't find

9          anything else in the car, that he would walk away

10         from here with just a couple of citations. I asked

11         if he understood, and he said that he did.

12    BY MR. FOULK:

13    •    At that point in time did you care about a baggie of

14    marijuana?

15    A     Not at all.

16    •    What, if anything, did Mr. Jennings say to you --

17    you can take the witness stand again, officer. What, if

18    anything, did Mr. Jennings say to you when you said you

19    wanted to get him out of car?

20    A     I asked him if he understood and he said yes.

21    •    Now, prior to him getting out of this vehicle, did

22    you ever ask the radio operator for assistance either in

23    getting the owner of the vehicle down there or a tow truck

24    driver or something like that?

25    A     Yes, when I found out that the driver's license was

1  suspended, there was no way that he could drive the car from

2  there.  So I asked that the owner be called to either come

3  and get the car or make arrangements to get the car or if

4  that couldn't be done, I would tow it.

5  •       I'm going to show you what we have marked

6  Commonwealth Exhibit Number 1. It will be for composite

7              MR.  FOULK:  I believe we have a

8              stipulation on this as well, Your Honor. May I

9              approach, Your Honor?

10             THE COURT:  Yes.

11 BY MR.  FOULK:

12 •       Mr. Knepper, I'm going to show you what we marked as

13 Commonwealth Composite Exhibit Number 1. I want you to take

14 a look in that envelope, and can you tell the ladies and

15 gentlemen of the jury, is that the bag of suspected

16 marijuana?

17 A       I can't seem to get this open. I'm having a little

18 trouble.

19 •       Here, let me.

20 A       Yes.

21 •       Is that what we would commonly call a nickel bag?

22 A       Yes.

23 •       Is there an accompanying lab report with that?

24 A       Yes, there is.

25 •       Can you read the date on the lab report and who it's

79

1    authored by?

2    A        The report date is August 30th of the year 2000,

3    authored by Ted A. Williams, Forensic Scientist, II.

4    Q        Okay.  And can you tell us the results of the

5    testing of that bag of marijuana?

6                        MR. CERASO:  Your Honor, we are willing

7              to stipulate as to the report's contents. And I

8              have no objection to Mr. Foulk reading it into the

9              record if he wishes.

10                       THE COURT:  All right.

11                       MR. FOULK:  Thank you, Your Honor.

12             Pennsylvania State Police confirm, Your Honor, that

13             Composite Exhibit Number 1, the small bag of

14             marijuana, is, in fact, indeed marijuana.  And I'd

15             move for the introduction of Commonwealth 1.

16                       MR. CERASO:  No objection, Your Honor.

17                       THE COURT:  Admitted.

18   BY MR. FOULK:

19.  •        Did you tell Mr. Jennings to get out of the car?

20   A        Yes.

21   •        Did he proceed to open the door?

22   A        No, I opened the door for him.

23   •        Now, you indicated that Officer White's car would

24   have been directly behind you as you opened the door?

25   A        No, he was alongside.

80

1    •        Alongside Mr. Jennings' vehicle?

2    A        Right.

3    •        So if you opened the door, and left it opened, was

4    there anywhere or any room for Mr. Jennings to go?

5    A        No.

6    •        Did you make -- I mean, I'm not faulting you and I'm

7    not trying to embarrass you, did you make a mistake as soon

8    as Jennings got out of the car?

9    A        Well, as soon as he got out of car, I wanted to have

10   him put his hands on the roof of the car so we could

11   handcuff him.  And I closed the door.

12   •        Where was Jay when. he got out of the car?

13   A        Officer White was on the right side of the car

14   coming around.

15   •        Did you wait for Jay to get all the way around the

16   car on the driver's side before you closed that door?

17   A        No.

18   •        Tell the ladies and gentlemen of the jury what

19   happened as soon as you closed the door to Jennings' car?

20   A        Jennings had his -- started to put his hand on the

21   roof of the car, I closed the driver's door, and at that

22   very instant he took off running.

23   •        What direction?

24   A        He went east on 12th Street.

25   •        What were you thinking at this point in time?

1  A       Why is he running, I mean, all I got is a couple of

2  citations and a small baggie of marijuana.

3  •       What were you going to do with the bag of weed?

4  A       If that's all that was in the car I would have

5  probably ripped it open and dumped it.

6  •       The person we know to be Charleton -- at this point

7  in time, did you know it was Charleton Jennings?

8  A       No, sir.

9  •       Did Officer White say, hey, this is Charleton

10  Jennings, I knew him from before?

11  A       No.

12  •       Jennings heads eastbound, what do you do, if

13  anything, as far as the radio goes?

14  A       I looked at Jay and I said, Jay, why don't you and

15  your dog go get him? And Jay said, yeah, okay. So Jay gets

16  in his cruiser and starts chasing after him.

17  •       Let me ask you this, Officer Knepper, you said, "why

18  don't you and your dog go ahead and get him," what do you

19  mean by that?

20  A       To capture him, to apprehend him, to bring him back

21  to where basically we were going to handcuff him.

22  •       Did you have any idea whether or not Officer White

23  was going to let his dog out of the vehicle at that point in

24  time?

25  A       I assumed that he would, if he needed the dog to

82

1    apprehend this guy running away from us.

2    Q        Did you ever tell Officer White to use his dog on

3    Mr. Jennings?

4    A        To tell him to use the dog on --

5    •        Yes.

6    A        No, no.

7    •        Jennings is eastbound, Officer White gets in his

8    vehicle and heads eastbound towards what building?

9    A        Towards the Erie Beer Company.

10   •        Did you indicate to anybody there was a pursuit?

11   A        Yes, as soon as I looked at Jay and asked, you know,

12   told him why don't you go get him, Jay got in his cruiser,

13   took off after him. Then I got on the radio, said the guyy

14   that we stopped just ran away and Jay is in pursuit.

15   •        Did you indicate on the radio where, if anywhere,

16   Mr. Jennings had turned up?

17   A        Yes, I could see him still running and I could see

18   Jay in his cruiser going after him with his lights on.

19   Q        Did you hear any commands from Officer Whiteover

20   the loud speaker?

21   A        No, I was busy talking on my own radio. I wasn't

22   paying attention to any sounds or anything like that.

23   •        Are you saying that you didn't hear any commands

24   over White's loud speaker, or are you saying that no

25   commands were given over White's loud speaker?

1    A        I didn't hear any.

2    •        Okay.  Do you know whether or not they were given if

3    you were on your own radio?

4    A        I didn't hear him.

5    •        As Officer White and Jennings run up between -- and

6    if you could step down, with the Court's permission, one

7    more time.

8                        THE COURT:  All right.

9    BY MR. FOULK:

10   •        Show the ladies and gentlemen of the jury where the

11   defendant cut up?

12   A        Okay.  We are stopped at the car here, as soon as he

13   started running, he started running along this way and as

14   soon as he got to this driveway, of Erie Beer, he cut

15   straight up this way to the south.

16   •        Obviously you lost sight of him, correct?

17   A        When -- yes, when Jennings got up to this area, this

18   is all fencing and stuff, I couldn't see him hardly at all.

19   I could still see Jay's cruiser, though, with the lights on,

20   coming up this way, and approximately about in this area

21   here is where I lost sight of everybody from because I was

22   still down here, and my vision was blocked by these shrubs

23   and bushes along the fence line.

24   Q        Okay.  Take your seat again. Now, we have spent

25   probably too many minutes here talking about this. Between

84

1    the time that you initiated the traffic stop -- and I'm

2    talking about whenn you actually stopped on 12th Street, not

3    when you were on Downing, how much time went by between the

4    time you initiated the traffic stop and you lost sight of

5    White and Jennings going up the alley between Penn Beer and

6    the fence at ABF?

7    A        I'd have to estimate ten or twelve minutes.

8    •        What were you doing after you lost sight of Jay

     White and Mr. Jennings behind Penn Beer?

10   A        I had been on the radio telling where the pursuit

11   was going and in as much detail as I possibly could up until

12   that point.  When I couldn't see them anymore is pretty much

13   to when I quit broadcasting any information because I had no

14   information to give.

15   •        After Jay White and Mr. Jennings got behind Penn

16   Beer what, if anything, did you hear?

17   A        I heard a gunshot.

18   •        How much time had passed between the time that

19   Jennings had taken off on foot and the time you heard the

20   gunshot?

21   A        I'm going to have to estimate, about a minute and a

22   half.

23   •        Okay.  What, if anything, did you do when you heard

24   that gunshot?

25   A        I didn't do anything immediately just thought it was

85

1    weird that -- why would there be a gunshot. Jay had his dog

2    with him, it should have been no contest as far as

3    apprehending this guy.

4    •        At this time of night, specifically on the night in

5    question, was there much traffic on 12th Street?

6    A        No.

7    •        Was there much traffic on Downing?

8    A        No.

9    •        When you heard the gunshot, were you in your car or

10   out of your car?

11   A        I was out of my car.

12   Q        Did you have your radio on so it in any way    were

13   there any other calls coming over the area to distract you

14   or when you heard that gunshot, was it relatively quiet for

15   that matter?

16   A        I'm sorry?

17   •        It's my fault. When you heard that gunshot, were

18   there any other noises that would have distracted you or was

19   it quiet?

20   A        It was quiet.

21   •        Have you worked with K-9 folks before?

22   A        No.

23   •        When I say worked with them, I mean on the street,

24   not, you, yourself as a K-9, but have you been present when

25   K-9s are let out of their cars?

86

1    A       Occasionally, yes.

2    Q       Okay.  When they get out of their cars, are they

3    quiet?

4    A       Yes.

5    Q       When they are told to attack and prior to an attack,

6    do they more or less start barking to give out  warnings or

7    to intimidate a suspect?

     A       I have never seen a police dog actually apprehend or

     attack anyone.  So I really can't speak to that. But

10   through experience I have had with the K-9s,  is that they're

11   more or less used for security at a crime scene or at a

12   dangerous traffic stop or in apprehension of a criminal

13   where the dog is --

14                      MR. CERASO:  Your Honor, I don't believe

15           he's being responsive to the question.

16-                     MR. FOULK: I'll rephrase the question,

17           Your Honor, and get right to it.

18                      THE COURT:  Please do.  I'm not even sure

19           he's qualified to answer it, to tell you the truth.

20   BY MR. FOULK:

21   Q       I'll get right to it. Prior to the time you heard

22   that shot, did you hear any dogs barking?

23   A       No.

24   Q       What were you thinking after you heard that shot

25   fired, other than what's going on here?

87

1    A        I thought that -- my initial thought was  that Jay

2    had fired a warning shot, and it surprised me.

3    Q        That's not standard procedure, a warning shot, **is**

4    it?

5    A        No, it's not.

6    Q        You're told not to fire warning shots, aren't you?

7    A        Right.

8    Q        What was the next thing you heard over the radio?

9    A        Within the next few seconds, I heard Jay get on the

10   radio saying that he was shot and that his gun was gone.

11   Q        What did you think at that point, Don?

12   A        I got scared, my heart drops, I got to my cruiser

13   and I raced up to where Jay was at.

14   Q        When you got to where Jay was, can you tell the

15   ladies and gentlemen of the jury what you saw?

16   A        **I** saw Jay leaning against the front fender of his

17   car in pain, and as I got to him, he said that "he shot me,

18   he shot me in the leg."

19   Q        I'm sorry, he said what?

20   A        He said "he shot me."

21   Q        Did he say who had shot him?

22   A        Not specifically.

23   Q        Did he ever say that Charleton Jennings just shot

24   me?  Did he say that Damon Willcott just shot me?

25                        MR. CERASO:  Your Honor, the question has

88

1      been asked and answered.

2                    THE COURT:  Sustained.

3    BY MR. FOULK:

4    Q      He said "he shot me"?

5    A      Yes.

6    Q      Did you ask who?

7    A      I assumed that it was the guy that --

8                    MR. CERASO:  Your Honor, again, it's been

9          asked and answered, and his assumption is

10         immaterial.

11                   THE COURT:  Just answer the question he

12         asked.  If you asked who; answer no if --

13                   OFFICER KNEPPER:  I don't think I did.

14                   THE COURT:  All right.

15   BY MR. FOULK:

16   Q      I'm going to show you what we have marked as

17   Commonwealth Exhibit Number 2.

18                   MR. CERASO:  I have no objection to the

19         photograph, Your Honor, and its admission into

20         evidence.

21                   MR. FOULK: It won't be on that list,

22         Your Honor, all the photographs are not.

23                   THE COURT:  All right.

24   BY MR. FOULK:

25   Q      I show you what we have marked as Commonwealth

1    Exhibit Number **2**, and albeit this photograph was taken

2    during the daylight hours, but let me ask you, Officer

3    Knepper, does Commonwealth Exhibit Number 2 accurately

4    depict the location where you found Officer White?

5    A       Yes.

6    •       When you arrived, were there any other officers yet

7    on the scene?

8    A       No.

9    •       Do you remember White's dog's name?

10   A       Rex.

11   •       Okay.  That's what I thought. Where was Rex?

12   A       Rex was out of the cruiser and staying near the

13   cruiser just running around.

14   •       Just running around?

15   A       Yes.

16   •       Was he barking?

17   A       No.

18   •       What did you do when you discovered Officer White?

19   A       I went right to him. I saw that his uniform had

20   already been dirty. I laid him down on the ground right

21   next to his cruiser, and just tried to keep him calm and as

22   much at ease as possible.

23   •       Did Officer White say anything else to you about how

24   this may or may not have happened?

25   A       I don't recall any conversation that we had, except

90

1  that I'm trying to keep him calm. I don't remember if he

2  told me anything or if I asked him anything.

3  •       Okay.   The Commonwealth Exhibit Number 2 depicts

4  some items on the ground near the car, is that correct?

5  A       Yes.

6  •       Can you tell the ladies and gentlemen of the jury

7  what is shown in that photograph on Commonwealth 2?

8  A       All right.

9  •       Just tell them, and I'm going to have the jurors

10 look at that in a moment.

11 A       All right.   Jay's pants and gun belt are laying on

12 the ground near the door of his cruiser. His watch is

13 broken and laying on the ground a few feet from that.

14 •       That differs from what you actually saw that night,

15 however, I'm assuming that White still had his pants on when

16 you got there?

17' A       Yes, this is -- the ambulance crew cut his pants

18 off.

19 •       Was Jay's watch laying on the ground when you got

20 there, though, that night?

21 A       Yes.

22 •       There's a little red flag there, too, is there not?

23 A       Yes.

24 •       Near the left rear wheel?

25 A       Right.

91

1  Q      Do you know what that was?

2  A      That's the bullet casing from the shot that Jay

3  White was hit with.

4  Q      Did you remain with Officer White until the medics

5  arrived?

6  A      Yes.

7                   MR. FOULK:  Move for introduction of

8            Commonwealth 2, Your Honor.

9                   MR. CERASO:  No objection.

10                  THE COURT:  Admitted.

11                  MR. FOULK:  Thank you.  Request

12           permission to publish, and I'll just continue, Your

13           Honor, is that okay?

14                  THE COURT: If you're going to publish to

15           the jury, you can't continue the questioning too.

16           Let's go with the questioning now, we will publish

17           at a more appropriate time.

18                  MR. FOULK: Sure.

19  BY MR. FOULK:

20  Q      After the medical personnel arrived, what did you

21  do, if anything?

22  A      Nothing really.  Just stayed in the area until Jay

23  was loaded into the ambulance and taken to the hospital.

24  Q      During the night in question, did you ever observe

25  either before the traffic stop, during the traffic stop, or

92

while Officer White was in pursuit of Mr. Jennings any

officer, and that would be you or Officer White,  remove

their weapon from their holster?

A        No.

•        At any time does officer white pop the door and

bring that dog out on Mr. Jennings?

A        No.

•        At any time did you hear Officer White or see

Officer White act in any threatening manner towards

Mr. Jennings?

         No.

Q       Did you?

A        No.

•        Did Officer White in your presence ever that night

even acknowledge who this guy was?

A        No.

•        Do you recall a radio transmission from station to

you that stated are you chasing Willcott?

A        I think somebody asked me that, yes.

•        As far as you knew, who was Jay White chasing?

A       Damon Willcott.  In fact, when I gave out the

description,   gave that name.

                    MR. FOULK:  Excuse me one second, Your

            Honor.  I believe I'm through.

BY MR. FOULK:

93

1    •        Did you ever ask Mr. Jennings where he was going

2    that night prior to or at the time that you stopped him?

3    A        I don't think I did.

4    •        Did he ever make any statements to you as to where

5    he was going?

6    A        I don't remember that he did.

7    •        You indicated that Mr. Jennings appeared calm

8    throughout the evening?

9    A        Yes, he was very calm and very cooperative.

10   •        Would that be true even after White arrived?

11   A        Yes.

12   •        At any time did Mr. Jennings say anything to Officer

13   White?

14   A        No.

15   •        Did you and White have the same color vehicles that

16   night'

17   A        No, Jay's vehicle was basically white as depicted in

18   the picture, and mine was basically black with some white

19   trim.

20   •        How come you guys have different colored cars, is

21   there any significance to that?

22   A        All -- apparently, my assignment that night was area

23   Bravo 3, and for whatever reason, Bravo 3 wasn't available,

24   so I took an extra car, which was E-2.

25   Q        I want to show what you we have marked as

# PART 4
# TESTIMONY OF H. GREGORY STRICKLAND
# COMMON PLEAS COURT
# NO.2409 OF 2000

1    COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

2              VS.             : OF ERIE COUNTY, PENNSYLVANIA

3    CHARLETON EARL JENNINGS    : CRIMINAL DIVISION

4                                No. 2406 of 2000

5


7                         **JURY TRIAL**

8                      **DAY THREE OF FIVE**

9


10       Proceedings held before the **Honorable Shad Connelly**, in

11       Courtroom A, Erie County Courthouse, Erie,

12       Pennsylvania, on Thursday, March 22, 2001, ~commeI~ inq

13       at 9:50 a.m.

14

15

16

17   APPEARANCES:

18   **BRADLEY H. FOULK, Esquire,** and
     **CHAD J. VILUSHIS, Esquire,** appearing on behalf of the
19   Commonwealth.

20   **THOMAS R. CERASO, Esquire,** and
     **JAMES M. ECKER, Esquire,** appearing on behalf of the
21   Defendant.

22

23

24

25   Jeanne M. Sykes - Official Court Reporter, RPR

1                              INDEX OF WITNESSES

2       NAME                              DIRECT              CROSS

3       1.   Jet fery John Bednarski       4  (Foulk)         19  (Ceraso)

4       2.   Jack Michael Wall            31  (Foulk)         39  (Ceraso)

5       3.   Carrie Flook                 45  (Vilushis)      47  (Ceraso)

6       4.   Kathryn Leopold              53  (Vilushis)      55  (Ceraso)

7       5.   Lester Fetterman             59  (Foulk)        108  (Ceraso)

8       6.   H. Gregory Strickland, Jr. 121  (Vilushis)     136  (Ceraso)

9       7.   John David Lubahn           154  (Foulk)        164  (Ceraso)

10      8.   James P. Wasielewski        166  (Foulk)        179  (Ceraso)

11      9.   Terry Richard Dawley        191  (Foulk)        228  (Ceraso)

12      NAME                              REDIRECT            RECROSS

13      1.   Jeffery John Bednarski       29  (Foulk)         29  (Ceraso)

14      2.   Jack Michael Wall            44  (Foulk)

15      3.   Carrie Flook                 51  (Vilushis)      52  (Ceraso)

16      4.   Kathryn Leopold              58  (Vilushis)      58  (Ceraso)

17      5.   Lester Fetterman            118  (Foulk)        120  (Ceraso)

18      6.   H. Gregory Strickland, Jr.  152  (Vilushis)     153  (Ceraso)

19      7.   Terry Richard Dawley        246  (Foulk)        249  (Ceraso)

20

21

22

23

24

25

1                        **DIRECT EXAMINATION**

2    **BY MR. VILUSHIS:**

3          Q.    Inspector, could you please state your full

4    name and occupation for the record?

5          A.    H. Gregory Strickland, Jr., City of Erie

6    Bureau of Police, Inspector of Police.

7          Q.    And how long have you been employed in that

8    capacity?

9          A.    Thirty-three years.

10         Q.    Were you so employed on July 7th of last year,

11   2000?

12         A.    I was.

13         Q.    Did something occur that day that brings you

14   into court?

15         A.    It did.

16         Q.    What was that?

17         A.    I was phoned at my home by the chief of police

18   approximately 3:30 a.m. that day and advised of the shooting

19   and assault of Officer Jay White.

20         Q.    What do you do as a result of that phone call?

21         A.    I dressed in full uniform, immediately went to

22   Saint Vincent hospital.  Stayed there for approximately five

23   to ten minutes, speaking to officers and learning the

24   condition of Officer White. I left there and drove to the

25   scene at 12th and Downing Street.

123

1          Q.     Just real briefly, if you could describe for

2     the jury what does an inspector do?

3          A.     Primary function is personnel management. I

4     do investigations of police officers accused of wrongdoing

5     or involved in any types of shooting where they are the

6     injured party or citizen may be, citizen is severely injured

7     or they are severely injured. In addition to that, I do

8     pre-employment background investigations.   Those are

9     prospective police officers or fire fighters or others that

10    may be seeking jobs in city government that have sensitive

11    positions.

12         Q.     So correct me if I'm wrong, because an officer

13    had been shot, that's why you were notified, correct?

14         A.     That's correct.

15         Q.     I believe you said you then went to 12th and

16    Downing?

17         A.     That's correct.

18         Q.     What happened when you got there, and what did

19    you observe?

20         A.     When I got to 12th and Downing, I met Sergeant

21    Marino and several ID officers in the process of processing

22    a Mazda that was the suspect's vehicle.

23         Q.     What else did you do?

24         A.     I spoke to those persons briefly about what

25    they were doing and intended to do. I drove behind Penn

1   Beer where I found two canine officers securing the vehicle

of Jay White.

3        Q.    After you had an opportunity to look at that

4   scene, what did you do next?

5        A.    I returned to 12th and Downing, spoke again to

6   Sergeant Marino, Sergeant Spizarny, Sergeant DeDionisio

7   arrived also and Deputy Chief Richard Szychowski.

8        Q.    What did you do next?

9        A.    I informed Sergeant Marino that I was going to

10  drive the perimeter, that being from Franklin to Downing,

11  18th to 12th Street, to see the position of the officers and

12  how they were doing and if they needed anything. I left

13  there, driving south on Downing from 12th Street.

14       Q.    Your Honor, permission to have the witness

15  step down briefly to utilize Courtroom Exhibit A?

16              THE COURT:  All right.  Keep your voice up.

17              MR. VILUSHIS:  Do you recognize Courtroom

18  Exhibit A?

19              THE WITNESS:  Let me orient myself here for a

20  minute.

21              MR. CERASO:  If you want to orient him, go

22  ahead please.

23              THE WITNESS:  If you could.

24              MR. VILUSHIS:  Would you agree or disagree

25  with me when I say that would be 12th Street?

1          THE WITNESS:  Yes, it appears to be 12th

2    Street.

3          MR. CERASO:  You can tell him what it is.

4          THE WITNESS:  Can see it now.

5    BY MR. VILUSHIS:

6      Q.    Does anything else look familiar?

7      A.    I have now seen the railroad tracks. I can

8    also see the area where the second shooting took place.

9      Q.    If I can have you back up a little bit so the

10   jurors can see. You could use the pointer. And I believe

11   you said you were going to go look at people's positioning.

12   Could you indicate with the pointer where you started

13   driving or what you started doing?

14     A.    I had come from 12th and Downing here, going

15   south, across this set of railroad tracks, cross this set of

16   railroad tracks and then to this general area down in here

17   where I met up with three cruisers and three police

18   officers.

19     Q.    Did you observe anything during your drive

20   that caught your attention?

21     A.    I did.  When in -- about in this particular

22   area here I observed Patrolman Paul McMahon dressed in plain

23   clothes walking with an African female, black African female

24   going north on the west side of the street.

25     Q.    Why did that catch your attention?

1        A.    At first in my mind Paul is a uniformed

2   officer normally.  I didn't realize he was out there -- he

3   had been brought in earlier on a different plain clothes

4   assignment.  And I said to myself, why is Paul out here on a

5   date?  I thought he was strolling along with this lady.  I

6   didn't acknowledge him nor he I, and I was in a plain

7   unmarked car.  I just drove past them and continued on to

8   where the cruisers were parked where I stopped and spoke

9   with those officers.

10        Q.    Do you recall how you parked your vehicle and

11   if those officers -- where their vehicles were parked?

12        A.    Yes.  As I pulled up, there was one vehicle

13   headed in the northerly direction, that being Officer

14   Dawley's.  Mine was headed in the northerly direction as was

15   that of Officer Fetterman and Officer Wasielewski, these all

16   being in approximately the center of the street.

17        Q.    What happened once you arrived at that

18   location?

19        A.    I stopped and spoke with them briefly. I

20   think the first thing out of my mouth is, what is McMahon

21   doing?  They explained to me this lady needed to cross the

22   area to go down and see her, I think, sick father and that

23   Paul was escorting her through there.

24              Then we discussed other matters. I think they

25   asked me if I had any idea how soon we might expect the

1    state police helicopter.   There may have been some other

2    small talk, and then a radio transmission came from Officer

3    McMahon.

4            Q.     And what was the content of that transmission?

5            A.     I believe radioed to Officer Fetterman asking

6    him to come to his position as he had a suspect or he

7    thought he had a suspect.

8            Q.     What happened next?

9            A.     At that point Officer Dawley, who was parked

10   adjacent to me but headed north, put his vehicle in gear and

11   took off.

12           Q.     What did you do?

13           A.     Myself, Officer Fetterman and Wasielewski had

14   to get in our vehicles    I was in my vehicle, they were

15   outside -- and get turned around in order to go to that

16   position.

17           Q.     I believe you said your vehicle was parked

18   going south; is that correct?

19           A.     Yes.   Mine, as was Fetterman's and

20   Wasielewski, were pointed in a southerly direction.

21           Q.     What happened next?

22           A.     At that point we all turned around. Fetterman

23   I think got turned around before I. I went immediately

24   after him, and Wasielewski was right behind me.

25           Q.     Could you indicate with a pointer where you

1    proceeded to?

2          A.    In this general area right here.

3          Q.    What happened when you got to that location?

4          A.    As I pulled up, I saw Officer Dawley's car in

5    the street, and I saw him coming from the vehicle with his

6    weapon drawn, and I was illuminating my headlights, and he

7    was yelling something in the direction west of the street,

8    to the grassy area west of the street over here.

9          Q.    Were you able to see where he was yelling?

10         A.    I could see where he was yelling, but I

11   couldn't see to whom he was yelling or what was going on

12   because there is a decline here away from the roadway, plus

13   there is heavy brush, and I was still seated in my car.

14         Q.    Did you see anyone else besides that officer?

15         A.    Out of the corner of my eye I could see

16   Officers Wasielewski and Fetterman, but I couldn't see any

17   other persons in this wooded area. I assumed Officer

18   McMahon was in there, as was probably the suspect, but I

19   couldn't see either of them.

20         Q.    May I have you take a seat? What if anything

21   happened next?

22         A.    As I said, as I was pulling up, I saw Officer

23   Dawley coming from his vehicle with his weapon drawn and

24   appeared to be yelling commands. I couldn't hear the

25   commands, but at some point just as I stopped my car or just

1    before I stopped my car at the curb I heard a shot. I

2    didn't see where the shot came from, but it sounded as

3    though it came from the vicinity of Dawley or the grassy

4    area.

5              At that point I started getting out of my

6    vehicle.  And it was within fractions of a second after the

7    first shot that a volley of shots went off as though someone

8    had lit a string of fire crackers.

9         Q.    What did you do as a result of that?

10        A.    I was out of my vehicle at this point crouched

11   down moving along some brush towards Dawley to try and see

12   what was going on down in the brush.

13        Q.    Did you make any transmissions at all?

14        A.    Not at that particular time.  A few minutes

15   later I transmitted shots fired, shots fired for the benefit

16   of the other officers in the command.

17        Q.    So I'm clear and the jury is clear, who all

18   could you see during this, you said sounded like fire

19   crackers going off?

20        A.    That's correct.  The only one I was

21   concentrated on was Terry Dawley. I knew out of the corner

22   of my eye there were other officers, Fetterman and

23   Wasielewski, but my vision was concentrated on Dawley and

24   hoping I could see what was going on down in the brush.

25        Q.    What did you see Officer Dawley doing as you

1    were watching him during this?

2            A.      As I watched him, he was firing at

3    approximately a 45-degree angle down, and there was a volley

4    of slots coming from other directions to -- from down in the

5    grassy area. I couldn't see muzzle flashes or I couldn't

6    see who was firing. At one point he yelled he'd been hit.

7    He grabbed -- I think his knee even buckled, left knee

8    buckled.  Then he proceeded on by, still concentrating on

9    them.  As I stood up, I could now see there were some other

10   persons down in there, down in the brush.

11           Q.      What did you see next?

12           A.      I was trying to keep my eye on Dawley to see

13   where he was headed, and he still had his weapon drawn and

14   pointing back at the area where the initial shooting had

15   taken place.  At about the same time I saw -- out of the

16   corner of my eye I saw Fetterman and Wasielewski run into

17   the area. I followed behind them, still keeping my eye on

18   Dawley because I knew he had been hit severely. About that

19   same time Officer McMahon, who was down in even further,

20   jumped up, grabbed his left hand, and I think he said

21   something to the effect my hand's been blown off and then

22   proceeded to run towards the street.

23           Q.      What did you do as a result of seeing this?

24           A.      Well, I wanted to keep my attention drawn on

25   Dawley because it was dark, and I didn't want to lose him

131

1    out there.   I didn't know how far back he was going to go.

2    Didn't want to lose him in the brush. I started to go into

3    help Officers Fetterman and Wasielewski with the suspect. I

4    saw they had him on the ground and appeared to get him under

5    control.   And also two other patrolman were running to their

6    position, that being Officer Lorah and I think Triana.

7         Q.    What happened next?

8         A.    I broke off and ran towards Dawley. I ran to

9    the brush back where he had gone down, and I found him at

10    this point sitting up, grabbing his left wrist and moaning.

11        Q.    Did you have an opportunity to speak with him?

12        A.    Yes, I asked him if he was hit anywhere else.

13    He said yeah, his knee. I grabbed his knee, and it was

14    bleeding profusely.   At that point I'm not sure it's then I

15    radioed for ambulances or at some time in there I did, but

16    it was decided -- either he made the suggestion or I did

17    that we get him closer to the street in order for him to be

18    more accessible to medical personnel.

19        Q.    Did you help him then get closer to the

20    street?

21        A.    Yes, I helped him up and we hobbled out to the

22    street, out to the sidewalk where he collapsed.

23        Q.    What happened next?

24        A.    Other officers came, and I gave him aid too.

25    We tried to apply pressure to his left knee, which, as I

said, was bleeding profusely. There were ambulances

2  summoned.  I might say once the ambulance did start to

3  arrive, the first ambulance went to the aid of Officer

4  McMahon, who was in the center of the street. A few moments

5  later another one arrived and came to Dawley's aid. At that

6  point I reached down and unholstered Dawley's weapon from

7  his -- removing it from his holster and taking possession of

8  his gun.

9      Q.    Why did you do that?

10     A.    Anytime there is an officer involved in a

11  shooting and he has in fact fired his weapon or suspected of

12  firing his weapon, it is the duty of the commanding officer

13  or the OIC at the scene to seize that weapon for processing

14  relative to whatever incident that may have occurred. And

15  that's why I removed the weapon from his holster. After

16  taking it out, the weapon was still cocked, I had to decock

17  it, meaning putting it on safety and placing the hammer down

18  on the chamber.

19     Q.    The fact that it was cocked, I believe you

20  said, what did that indicate to you?

21     A.    That it had been fired or that the weapon had

22  actually been cocked as a result of pulling the slide to the

23  rear, but I knew it had been fired in the gun. Therefore,

24  he had not placed the safety on. He had merely holstered

25  it.

1          Q.    I am showing you what's been marked as

2     Commonwealth's Exhibit 19.  Do you recognize that?

3          A.    Well, the best recognition of this weapon

4     would be via my weapon of the serial number and that on the

5     gun.  The serial number on this weapon is the same as that

6     in my report being that it's a Ruger P89, Serial No.

7     310-73172, a City-of-Erie-issued weapon.

8          Q.    So that would be the weapon that you took that

      night?

10         A.    That would in fact be.

11         Q.    After you did that, what happened next?

12         A.    At that time the medical personnel were

13    beginning to attend to him, getting ready to place him on

14    his gurney, giving him immediate first aid in order to

15    transport.  Not only he but Officer McMahon. I went over to

16    check the condition of the suspect.

17              At this point I think it was Officer Fetterman

18    who came to me and said that the suspect also had been shot.

19    At this point I said to a female EMT, emergency medical

20    technician, that the suspect was also in need of medical

21    attention.  And I also radioed for a third ambulance in

22    order to transport him.

23         Q.    Did you proceed over to where the suspect was

24    located?

25         A.    I did.

1    Q.    And what did you find or what did you see when
2    you got there?
3    A.    I didn't go down in the brush. As a result of
4    helping Dawley out, I injured my knee. And I later learned
5    I had torn a cartilage and it required surgery.    There was
6    sufficient personnel down in the brush    They were
7    restraining the suspect at that time and holding him. I
8    think there were two or three officers on him or around him,
9    restraining him, keeping him there until he could be
10   evacuated.
11   Q.    What happened next?
12   A.    A short while later another ambulance arrived.
13   I think the medical personnel were also treating him at that
14   time prior to the arrival of the ambulance. Once the
15   ambulance arrived there they brought a backboard over. I
16   was informed that his injuries -- he had been shot at least
17   twice, none of which appeared life threatening nor was he in
18   any imminent danger.    They brought out a backboard.
19        At the time while he was on the ground he had
20   his hands handcuffed to the rear. As they began to put him
21   on the backboard, I didn't want him face down on the
22   backboard nor did I want his hands loose in the front. I
23   instructed the officers who were putting him on the
24   backboard to utilize two sets of handcuffs, handcuffing each
25   wrist individually to the backboard itself. On the side of

1    a backboard there is holes for people to lift the backboard.

2    So I placed him in a position where he would not have any

3    great mobility but would be more comfortable than being on

4    his face, plus he would not be easily readily available to

5    grab another officer's gun.

6         Q.    So correct me if I'm wrong, you in essence

7    were supervising the removal of the suspect from that

8    location, correct?

9         A.    That's correct.

10        Q.    Was there anything else that you indicated

11   should be done as pertaining to the suspect being removed?

12        A.    I did.   In most shooting incidents, if you

13   can, you want to maintain a certain amount of evidence on

14   the suspect's hands.   This is for laboratory analysis to

15   determine powder residue and so forth.   And if you can, it's

16   a good idea to bag the hands of a suspect. I asked if

17   anyone had any paper bags. I believe a medical technician

18   did bring some paper bags out. They attempted to bag his

19   hands while he was on the backboard handcuffed. But as I

20   saw them carrying him to the ambulance, those bags fell off

21   so I didn't bother with it any more.

22        Q.    Did you indicate anything to any officers

23   regarding the defendant?

24        A.    I did.   I wanted at least two police officers

25   to accompany him to the hospital in the ambulance, that

1  being Sergeant Joseph Kress who arrived at the scene and I

2  believe another patrolman, Morris.

3        Q.    And I am assuming that they went along then

4  with the defendant in the ambulance?

5        A.    They did.

6        Q.    One moment, Your Honor.

7              (Off-the-record discussion.)

8        Q.    Nothing further.

9              THE COURT:  All right.  Mr. Ceraso?

10                    **CROSS EXAMINATION**

11  **BY MR. CERASO:**

12        Q.    Thank you, Your Honor. Sir, did you issue any

13  orders -- basically you have indicated that you were in

14  charge of the custody of Mr. Jennings. Did you issue any

15  orders to anybody that no one was to see him, like his

16  family, at the hospital?

17        A.    I did not.

18        Q.    Now, sir, as I understand, you are coming

19  after you had gone up and turned around, you're coming north

20  on Downing, right?

21        A.    You're referring to after the radio

22  transmission from Officer McMahon?

23        Q.    Right.

24        A.    Yes.

25        Q.    As you are traveling north, there are three

1  cars involved going north, right, from the location that you

2  had previously been above the tracks?

3       A.    The first car would have been Officer

4  Dawley's.

5       Q.    Let's stop with Officer Dawley, slowly if you

6  can?

7       A.    Correct.

8       Q.    Who is the second car, if you know?

9       A.    Patrolman Fetterman.

10      Q.    When you turned around, were you able to see

11  both Patrolman Fetterman's car and Officer Dawley's car?

12      A.    I don't really recall. I can't say I actually

13  had that fact in my mind, no.

14      Q.    Were they the two vehicles in front of you?

15      A.    Dawley was considerably further ahead of all

16  of us. I was almost immediately behind Fetterman,

17  Wasielewski immediately behind my car.

18      Q.    How much distance was there between

19  Fetterman's automobile and Dawley's if you can tell us,

20  let's say when they crossed the railroad tracks, the second

21  set of railroad tracks?

22      A.    I have no. idea, sir.

23      Q.    So you weren't able to observe that; is that

24  correct?

25      A..   I wasn't really concentrating on Fetterman's

1          A.     Correct.

2          Q.     Sir, you indicated that you saw Mr. Jennings

3     when he was down on the ground, face down, correct?

4          A.     That's correct.

5          Q.     And you saw the attempt to handcuff him?

6          A.     They were subduing him. They hadn't had him

7     handcuffed as yet. They appeared to be gaining control of

8     him, and there were two other officers coming to their aid.

9          Q.     If you can recall, what were they doing to

10    subdue him?

11         A.     Grabbing him by his arms, trying to contain

12    him, control him.

13         Q.     He was finally handcuffed, right?

14         A.     I didn't see that, but he was.

15         Q.     You did see him handcuffed --

16         A.     I saw him -- later time I saw he was in fact

17    handcuffed, but I didn't see him being handcuffed.

18         Q.     Ambulances came.   First ambulance, right?

19         A.     Correct.

20         Q.     Who was the first person taken from the scene?

21         A.     Taken from the scene?

22         Q.     Yes.

23         A.     I don't know.

24         Q.     How long was it before Mr. Jennings was taken

25    from the scene, if you know?

1      A.      It was after the other two officers or the two

2   officers had been evacuated. I don't know the time.

3      Q.      So the two officers were evacuated, right?

4      A.      Correct.

5      Q.      And you stayed there until Mr. Jennings was

    evacuated, correct?

7      A.      I stayed there until *8:00* o'clock in the

    morning.   I don't know what time he was evacuated.

9      Q      Did an hour go by before he was evacuated?

10     A.      No.   I'm saying that I remained at that scene

11   long after he had been evacuated, main --

12     Q.      I understand.

13     A.      *An hour, by* no means.

14             How long?

15     A.      I can't speculate, but certainly wasn't an

16   hour.   Shortly after they were being treated another

17   ambulance arrived, treated him.   As I said, I had him

18   handcuffed to the backboard for a better restraint, tried to

19   bag his hands. They had given him initial triage and

20   emergency treatment there at the scene, and then he was

21   placed in the ambulance, transported.

22     Q.      And, sir, you knew, as I understand based on

23   what you're saying, that with reference to the shots that

24   were taking place in this underbrush that was there, that

25   they were coming from what direction, or could you tell?

1       A.      They were coming from my left, down in the

2    brush.

3       Q.      Did you have any impression that any of them

4    were even close to you?

5       A.      I had no idea. I couldn't see the muzzle

6    blast.   They could have been coming in my direction.

7       Q.      They could have been?

8       A.      I have no idea.

9       Q.      I have nothing further.

10                  **REDIRECT EXAMINATION**

11   BY MR. VILUSHIS:

12       Q.      Do you see the suspect you are referring to

13   July 7th of last year, do you see him in this courtroom

14   today?

15       A.      I cannot recognize that man.

16       Q.      The suspect that you saw that night, did you

17   ever indicate to anyone that he was not to receive medical

18   treatment?

19       A.      No.   In fact, as I said, I went and told the

20   female EMT that he was in need of medical attention also and

21   then radioed for an ambulance once I learned that he too had

22   been injured and shot.

23       Q.      Did you ever indicate to anyone that the

24   suspect was to receive delayed treatment?

25       A.      By no means.

# PART 5
# TESTIMONY OF JOHN LUBHAN, MD
# COMMON PLEAS COURT
# NO.2409 OF 2000

1          Q.     How far is that from the scene where this

2     shooting occurred?

3          A.     I can only speculate, sir. Perhaps five

4     miles, three miles.

5          Q.     If I were to tell you he was admitted at 7:18

6     in the morning and this happened about 5:30, would that

7     refresh your recollection as to how long he laid out there?

8          A.     No.

9                 Thank you.

10                THE COURT:   You may step down. Call your next

11    witness.

12                MR. FOULK:   Dr. John Lubahn please.

13                **JOHN DAVID L UBABN**,  having been

14    duly sworn, was examined and testified as follows:

15                         **DIRECT EXAMINATION**

16    **BY MR. FOULK:**

17         Q.     Good afternoon, Doctor.  Will you tell us your

18    full name?

19         A.     John David Lubahn.

20         Q.     What is your occupation, sir?

21         A.     I'm a physician.

22         Q.     How long have you been a physician here in the

23    Commonwealth and what is your specialty?

24         A.     I started to practice in Pennsylvania in 1981,

25    and I am an orthopedic surgeon with a subspecialty interest

1    in hand.

2        Q.    How many times, if any, have you been

3    qualified as an expert witness within the Commonwealth?

4        A.    I couldn't give you an exact number.

5            MR. CERASO:   We'll stipulate to the doctor's

6    qualifications as an orthopedic surgeon and that he is an

7    expert in that field qualified to testify.

8    BY MR. FOULK:

9        Q.    With a subspecialty in hand?

10       A.    Yes.

11       Q.    Doctor, you are here today pursuant to a

12   subpoena, and I believe you were requested to review medical

13   records prior to coming in; is that correct?

14       A.    Yes.

15       Q.    Did you in fact review the medical records for

16   a patient by the name of Charleton Jennings?

17       A.    Yes, I did.

18       Q.    Did you review some medical records for Terry

19   Dawley?

20       A.    Yes, I did.

21       Q.    And Paul McMahon?

22       A.    Yes.

23       Q.    Were all three of these individuals patients

24   of yours?

25       A.    Yes.

Q.      Are you familiar with the recordkeeping
practices at Saint Vincent's Health Center?

A.      Yes.

Q.      I'm going to show you what was previously
marked as Defense Exhibit E. May I approach, Your Honor?

THE COURT:   Yes.

7    BY MR. FOULK:

8       Q.      Ask you, sir, if these are the medical records
from Saint Vincent's hospital dealing with Mr. Jennings?

10      A.      They appear to be, yes.

11      Q.      Would your file in any way be smaller,

12   somewhat smaller than the actual medical records from Saint

13    's in total?

14      A.      Yes.

15      Q.      Are you familiar with that face sheet there?

16   Is that pretty similar to most patients when they are

17   admitted?

18      A.      Yes.

19      Q.      Is there a date of admission?

20      A.      It appears to be July 7th.

21      Q.      Is there a time of admission?

22      A.      Looks like 5:41 a.m.

23      Q.      Not 7:00 something, 5:40 something?

24      A.      Looks like 0541.

25      Q.      And is there a time when this first form was

1    printed out or when he was entered into the computer?

2           A.    0542.

3           Q.    5:42?

4           A.    Yes.

5           Q.    Thanks.

6                 MR. CERASO:  May I see your records?

7                 (Documents handed to Mr. Ceraso.)

8    BY MR. FOULK:.

9           Q.    Sorry about that little delay. Doctor, how

10   did you happen to be consulted on Mr. Jennings?

11          A.    I was called by the emergency room to see

12   really all three of the individuals injured.

13          Q.    Approximately what time did you see

14   Mr. Jennings on July 7th?

15          A.    I'd be guessing. I think it was probably

16   around 6:00, 6:30.

17          Q.    Did you have an opportunity to physically

18   observe Mr. Jennings?

19          A.    Yes.

20          Q.    Did you see any signs of trauma other than the

21   gunshot wounds?

22          A.    No.

23          Q.    Any facial swelling?

24          A.    Not extraordinary, no.

25          Q.    Any at all that you found noteworthy?

A.    None that I remember.

Q.    Would it be safe to say that your reason for being there was as a result of a bullet wound to one of Mr. Jennings' hands?

A.    Yes.

Q.    Which hand was that, sir?

A.    It was his left hand.

Q.    I'm sorry?

A.    His left hand.

10    Q.    Did you take a history from Mr. Jennings?

11    A.    I did.

12    Q.    And what was the history given?

13    A.    That he had been injured, that there was not a

14    lot of details involved in it. I knew that he had been

15    involved in an altercation that evening, but I really had no

16    details.

17    Q.    Have you treated prior gunshot victims?

18    A.    Yes.

19    Q.    Now, rather than go through the entire

20    procedure that you conducted on Mr. Jennings, can you tell

21    the ladies and gentlemen of the jury whether or not you were

22.    able to determine a point of entry in Mr. Jennings' left

23    hand?

24    A.    He had a wound on the -- what I call the

25    dorsum of his left hand, between his index and his middle

1    finger metacarpals.   It's the top of the hand.   That was the

2

3          Q.     Is this the dorsal?

4          A.     That's the palm side, that's the dorsal side.

5          Q.     Was there an exit wound?

6          A.     Not that I saw, no.

7          Q      Can you describe for the ladies and the

8    gentlemen of the jury the type of wound you observed and

9    what damage it did if any?

10         A.     It was a relatively small hole, and it

11   fractured the metacarpals. It caused significant amount of

12   bleeding and caused pressure on his nerves so that his

13   fingers were numb, and I later made an incision on the

14   palmar side of his hand to relieve the pressure on his

15   nerve.

16         Q.     Was there any evidence of any -- other than

17   after you made the incision obviously, any evidence of any

18   entry wound to any palm of either hand?

19         A.     Not that I saw, no.

20         Q.     Would you have seen something like that,

21   Doctor?

22         A.     I believe I would have.

23         Q.     To the best of your knowledge, does

24   Mr. Jennings still have some projectile fragments and bone

25   fragments in any hand?

1    A.    Yes.

2    Q.    Why were they not removed?

3    A.    They were in the muscles of the hand, which

4  are very small. And it's usually more trauma to the hand to

5  find those small fragments and remove them than it is to

6  leave them in place. If they become symptomatic later, they

   can be removed later.

8    Q.    Given the damage to the hand and given the

9  various factors that are involved, were you able or are you

10 able today to tell the ladies and gentlemen of the jury the

11 trajectory or the angle of the bullet at which it entered

12 his hand?

13   A.    No.

14   Q.    When was the last time you saw Mr. Jennings?

15   A.    I believe it was July 25th, 2000.

16   Q     Did you also have the opportunity to treat

17 Mr. McMahon?

18   A.    Yes.

19   Q.    Did you review those records?

20   A.    Yes.

21   Q.    Can you tell the ladies and gentlemen of the

22 jury approximately what time you saw Mr. McMahon?

23   A.    I was led either by the triage nurse or one of

24 the physicians in the emergency room to see, my recollection

25 is all three of the individuals, one after the other, and I

1    can't remember which I saw first.

2          Q.    You had a lot going on that morning, right,

3    Doctor?

4          A.    Yes.

5          Q.    Can you tell the ladies and gentlemen of the

6    jury what Officer McMahon's injuries were?

7          A.    He lost his left small finger.

8          Q.    Did the left small finger come to the hospital

9    with him?

10         A.    It did.

11         Q     Did you make a determination whether or not it

12   was capable of being reattached?

13         A.    Theoretically it could have been, but    would

14   have been much shorter and would have been missing the

15   middle knuckle.  It would have looked unusual, been

16   relatively numb or anesthetic and in the way. So a single

17   digit in an adult amputated at that level is not the sort of

18   thing that I or any of my associates would ever reattach.

19         Q.    Doctor, based upon your experience -- and I

20   recognize you're not a forensic pathologist, but given your

21   experience, are you able to tell the ladies and gentlemen of

22   the jury whether or not the wound was from the dorsal side

23   or from the palm side of Mr. McMahon's hand?

24         A.    No.

25               You could not render an opinion on that?

1    A.    Not really.  It was badly damaged.  The edges

2    of the skin were traumatized, but I couldn't tell whether it

3    was from the top or the bottom.

4    Q.    Did you also have an opportunity to examine

5    Terry Dawley?

6    A.    Yes.

7    Q.    And can you tell the ladies and gentlemen of

8    the jury what Officer Dawley's injuries were to his hand

9    specifically?

10    A.    He had similar wounds from the size and

11    appearance, but I could not tell whether there was a wound

12    on the top and the bottom of his hand, and I couldn't tell

13    which would have been the entrance and which would have been

14    the exit.

15    Q.    Why is that?

16    A.    They were both relatively small wounds.

17    Usually the exit wound is larger, but these were both pretty

18    small.

19    Q.    Can you tell the ladies and gentlemen of the

20    jury the nature of Terry's wounds and whether or not in your

21    opinion he is going to suffer from any disability as a

22    result of those wounds?

23    A.    Mr. Dawley was unique in that he had had a

24    previous operation on his hand. He had a fusion to the

25    wrist so the bullet went through the fused area, broke the

1    fusion, injured the nerve much in the way Mr. Jennings

2    injured some tendons. In Mr. Dawley's case, one of his

3    tendons in particular doesn't come out straight on the top

4    of his hand so his fingers don't extend as much as they used

5    to.   And I have mentioned to him that in the future at some

6    point a tendon transfer to restore that might be necessary.

7         Q.    Is that a guarantee, Doctor, that you would be

     able to do that?

9         A.    It's a guarantee that it would be possible,

10   not restore normal function.

11        Q.    Do you have a professional opinion based upon

12   a reasonable degree of medical certainty as to whether or

13   not Mr. Dawley will ever have full range of motion with his

14   right hand -- with his left?

15        A.    Well, it would be my opinion that he didn't

16   have normal motion before.   He has less motion and function

17   now.

18        Q.    Do you have an opinion as to whether or not he

19   will be able to regain full motion in that hand?

20        A.    He will not.

21        Q.    He will not?

22        A.    (Nods head affirmatively.)

23        Q.    Any dog bites on Mr. Jennings that day?

24        A.    Not that I noticed.

25        Q.    Did you examine his arms and both hands?

# PART 6
# OPINION OF THE SUPERIOR COURT OF PENNSYLVANIA AFFIRMING PLAINTIFF' S CONVICTIONS

COMMONWEALTH OF PENNSYLVANIA,

IN THE SUPERIOR COURT OF PENNSYLVANIA

Appellee

CHARLTON E. JENNINGS,

Appellant     :     NO. 1407 WDPEQ 1

Appeal from the Judgment of Sentence Entered on May     01=
And the Order Entered on July 31, 2001,
In the Court of Common Pleas of Erie County, Pennsy
Criminal, at No. 2406 - 2000

BEFORE: HUDOCK, TODD, and GRACI, JJ.

MEMORANDUM:

F 1 LED MAR.! 1.1003

Appellant, Charlton E. Jennings ("Jennings"), appeals from the *judgment entered on May 4, 2001, in the Court of Common Pleas of Erie* County, sentencing him to a total of thirty-four-and-one-half years to seventy-one years imprisonment, and from the order entered on July 31, 2001, denying the motion to discharge him. After careful review, we affirm.

## I.     FACTUAL AND PROCEDURAL HISTORY

In March 2001, a jury found Jennings guilty of criminal attempt (homicide), 18 Pa.C.S.A. § 901, two counts of aggravated assault, 18 Pa.C.S.A. § 2702, recklessly endangering another person, 18 Pa.C.S.A. § 2705, robbery, 18 Pa.C.S.A. § 3701, theft by unlawful taking or disposition, 18 Pa.C.S.A. § 3921, possessing an instrument of crime, 18 Pa.C.S.A. § 907, carrying a firearm without a license, 18 Pa.C.S.A. § 6106 escape, 18 Pa.C.S.A. § 5121, resisting arrest or other law enforcement, 18, Pa.C.S.A. §

5104, driving while operating privilege is suspended or revoked, 75 Pa.C.S.A. § 1543, and violating vehicle lighting requirements, 75 Pa.C.S.A. § 4303, with respect to an incident involving the shooting of three Erie police officers in July 2000. [1]

On May 4, 2001, Jennings was sentenced to a total of thirty-four-and-one-half years to seventy-one years imprisonment.    On May 10, 2001, Jennings filed a motion to modify his sentence, arguing that his sentencing was inconsistent since one of his sentences was in the standard range recommended by the Sentencing Guidelines[2] while his other sentences were in the aggravated range.    On May 11, 2001, Jennings' motion was denied, and, in a footnote, the lower court stated that Jennings' sentence for criminal attempt (homicide) was in the standard range and not in the aggravated range since the "maximum sentence allowable by law (20-40 years) on this charge (Attempted Murder) fell within the standard range." Order, 5/11/02.

On May 14, 2001, Jennings fled a motion for discharge, arguing that the Commonwealth should have made him aware of a grievance fled by the Fraternal Order of Police ("FOP") asking for a comprehensive review of the matters which were the subject of the charges filed against him and which

---

[1]    At the conclusion of the Commonwealth's case-in-chief, Jennings moved for a judgment of acquittal, arguing that the Commonwealth produced contradictory evidence. The trial court granted that motion with respect to one count of recklessly endangering another person.

    20.4 Pa. Code 303.

could have led to the discovery of officer errors.    Motion for Discharge of

Defendant, 5/14/01.    On July 3, 2001, a hearing was held with regard to

Jennings' motion for discharge, and, on July 31, 2001, the lower court

denied Jennings' motion, stating, *inter alia,* that "any issues pursuant to a

potential grievance hearing or critical incident review between the [FOP] and

the Erie Police Department were separate and apart from and/or immaterial

to the defendant's criminal trial[.]" Order, 7/31/01.

On August 13, 2001, Jennings filed a notice of appeal from the orders

denying the motions to modify his sentence and to discharge him. Jennings

raises the following issues on appeal: _

> Whether the lower court erred in not granting the motion for
> judgment of acquittal?


> Whether the lower court erred in not granting the motion for
> modification of sentence?


> Whether the lower court erred in nott granting the motion to
> discharge defendant?


Appellant's Brief, at 3.

## II.    DISCUSSION

Jennings first argues that the lower court erred in not granting his

*motion for a judgment of acquittal at the close of the Commonwealth's case-.*

in-chief since the ' Commonwealth presented : several :;witnesses whose.

testimony was contradictory.[3]  "A challenge to the sufficiency of the evidence

is a question of law requiring a plenary scope of review."  **Commonwealth**

**v. Krouse, 799** A.2d *835, 837* (Pa. Super. 2002) (citation omitted). "The

appropriate standard of review regarding the sufficiency of the evidence is

'whether the evidence admitted at trial and all reasonable inferences drawn

therefrom, when viewed in the light most favorable to the Commonwealth as

the verdict winner, is sufficient to support all the elements of the offenses."

*Id.* at 837-38 (citation omitted). "As a reviewing court, we 'may not weigh

the evidence and substitute our judgment for that of the fact-finder." Id. at

838 (citation omitted). "[A] fact-finder is free to believe 'all, part or none: of

the evidence presented." *Id.* (citation omitted).   Furthermore, "[a] mere

conflict  of  testimony  does  not   render the evidence insufficient."

**Commonwealth v. Dolan,**  429 A.2d 1171, 1173 (Pa. Super. 1981)

(citations omitted).[4]

   Jennings was found guilty of criminal attempt (homicide) (Officer Terry

Dawley), -two counts of aggravated assault (Officers Jay White and Dawley),

---

[s]    Rule 606 of the Pennsylvania Rules of Criminal Procedure states that a defendant "may challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged in • .  .  .  a motion for judgment of acquittal at the close of the Commonwealth's case-in-chief." Pa.R.Crim.P. 606(A)(1).

[a]    *we address this issue despite a generally inadequate brief.   Jennings' entire* argument on this issue consists of one-and-a-half pages. Other.than generally mentioning inconsistent testimony by some Commonwealth witnesses, he does not explain how the testimony  was inconsistent and how the inconsistency ..results.. in the complained. .of,~ insufficiency. Inadequate argumentation may result in waiver on appeal.  **See Common= - wealth v. Alsop,**  799 A.2d 129, 135 (Pa. Super. 2002) (citations omitted). Nonetheless, we will address the merits of thus claim. =                              .  -'

recklessly endangering another person (Officer Lester Fetterman), robbery (Officer White), theft by unlawful taking (Officer White), possessing an instrument of crime, carrying a firearm without a license, escape (Officers Donald Knepper and White), and resisting arrest (Officer White). [5]

Criminal attempt (homicide) is defined as a substantial step toward causing the death of another human being, with the intent to cause the other human being's death.    18 Pa.C.S.A. § 901(a);  *id.*  § 2501(x);  *see also* **Commonwealth v. Hobson,**  604 A.2d 717, 719 (Pa. Super. 1992) (quotation omitted).    The record. reveals that Jennings took a substantial step toward causing Officer  Dawley's  death and that Jennings intended to cause Officer Dawley's death. Officer Dawley testified that, after command-ing Jennings to get on the ground at least three times during the attempted arrest of Jennings, he witnessed. Jennings lower his hands and pull out a handgun.    N.T. Trial, 3/22/01, at 217.    As Officer Paul McMahon was attempting to restrain Jennings, Jennings shot at Officer Dawley, striking him in the left hand.    *Id.*  at 218-20.    Moreover, after Officer McMahon and

---

[5]    We note that, at the end of the Commonwealth's case-in-chief, Jennings made a general motion for judgment of acquittal with respect to all of the offenses for which he was charged except for driving while his operating privilege was suspended or revoked and violating vehicle lighting requirements.    Jennings' general  motion was based on the allegedly conflicting testimony of Officer White and witness Rain Stovall and on the allegedly conflicting testimony of Officers McMahon and Dawley. Jennings also made specific motions for judgment of acquittal at the end of the Commonwealth's case-in-chief with respect to two crimes for which he was later convicted, escape and robbery. According to Jennings, the Commonwealth presented insufficient evidence of certain elements of those crimes. Since Jennings did not brief the issue of insufficient evidence of certainn elements of escape *and robbery, however, we may not consider it on appeal.*  **See Alsop,** 799 A.2d at 135 (failure to properly brief issue including full argument results in waiver) (citations omitted).

J-A41013-02

Jennings fell to the .ground, Jennings fired several more shots at Officer

Dawley, striking him in the back of his knee and in the right thigh.   *Id.* at

221-23.

Aggravated assault is defined as attempting to cause or intentionally,

knowingly or recklessly causing serious bodily injury to a police officer while

in the performance of duty. 18 Pa.C.S.A. § 2702(a)(2), (c)(1);  **see also**

**Commonwealth v. Jones, 629 A.2d** 133, 137 (Pa. Super.  *1993)* (citation

omitted).   The record reveals that Jennings intentionally caused serious

bodily injury to Officer White while in the performance of duty. Officer White

testified that when he was attempting to arrest Jennings, Jennings punched

him in the left temple. N.T. Trial,  *3/20/01* at 187. Jennings then wrestled

Officer White to the ground, *id.* at 187, removed a gun from Officer White's

holster, *id.* at *191,* and shot him in the right groin area, *id.* at 191-92, 198.

The record also reveals that Jennings intentionally caused serious

bodily injury to Officer Dawley while in the performance of duty. As we

noted above, Officer Terry Dawley testified that, after commanding Jennings

to get on the ground at least three times, he witnessed Jennings lower his

hands and pull .out a handgun.   N.T. Trial, 3/22/01, at 217.   As Officer

McMahon was attempting to restrain Jennings, Jennings  shot at Officer

Dawley, striking him in the left hand.  *Id*, at 218-20. Moreover, after Officer

McMahon and Jennings fell to the ground, Jennings fired several more shots

at Officer Dawley, striking him in the back of his knee and in the right thigh.
*Id.* at 221-223.

Recklessly  endangering another person is defined as recklessly
engaging in conduct which places another person in danger of death or
serious bodily injury. 18 Pa.C.S.A. § 2705; ***see also Commonwealth*** v.
***Klein,*** *795 A.2d 424, 427-28 (Pa. Super. 2000) (citations omitted). The*
record reveals that Jennings recklessly engaged in conduct which placed
Officer Fetterman in danger of death or seriously bodily injury.   Officer
Fetterman testified that he was within ten to fifteen feet of Jennings and
Officer Dawley when .Jennings fired several uncontrolled shots. N.T. Trial,
3/22/01, at 101.

Robbery is defined as inflicting serious bodily injury upon another in.
the course of committing a theft. 18 Pa.C.S.A. § 3701(a)(1)(i); ***see also***
***Commonwealth v. Uderra;***   *706 A.2d 334, 341. (Pa. 1998) (citations
omitted).   An act is "in the course of committing a theft" if it occurs in an
attempt to commit theft or in flight after the attempt or commission. 18
Pa.C.S.A § 3701(a)(2); . *Uderra,* 706 A.2d at 341. The record reveals that
Jennings inflicted serious bodily injury to Officer White after stealing Officer
White's gun.   As We noted above, Officer White testified that when he was
attempting to arrest Jennings, Jennings punched him in the left temple.. N.T.
Trial, 3/20/01 at 187. Jennings then wrestled Officer White to the ground,
*id. at 187, removed a gun from Officer White's holster_s id. at 191, and shot_*

7

him in the right groin area, *id.* at 191-92, 198. Jennings then ran away with the gun. *Id.* at 194.

Theft by unlawful taking or disposition is defined as the unlawful taking of the movable property of another with the intent to deprive him thereof. 18 Pa.C.S.A. § 3921(a); **see also Commonwealth v. Crawford,** **427 A.2d 166, 170 (Pa. Super. 1981)** (citation omitted). The record reveals that Jennings unlawfully took Officer White's gun with the intent to deprive him thereof. As we noted above, Officer White testified that Jennings stole **Officer White's gun, N.T. Trial, 3/20/01 at 191, and ran off with it.** *Id.* at 194.

Possessing an instrument of crime is defined as possessing a firearm concealed upon oneself, under circumstances not manifestly appropriate for lawful use, with the intent to employ it criminally. **See** *18* Pa.C.S.A. § 907(b); **see** *also Commonwealth v. Foster,* 651 A.2d 163, 165 (Pa. Super. 1994) (citations omitted). The record reveals that Jennings possessed a firearm concealed upon himself, under circumstances not manifestly appropriate for lawful use, with the intent to employ it criminally. As we noted above Officer White testified that Jennings removed a gun from Officer White's holster, N.T. Trial, 3/20/01, at 191, and shot him in the right groin area, *id.* at **191-92; 198. Jennings then ran away with the gun. *Id.* at 194. Officer** Dawley' testified that, after later commanding Jennings to get on the ground at least three times during the attempted arrest of Jennings;"

he witnessed Jennings lower his hands and pull out a handgun. N.T. Trial, 3/22/01, at 217. As Officer McMahon was attempting to restrain Jennings, Jennings shot at Officer Dawley, striking him in the left hand. *Id.* at 218-20. Moreover, after Officer McMahon and Jennings fell to the ground, Jennings fired several more shots at Officer Dawley, striking him in the back of his knee and in the right thigh. *Id.* at 221-223.

Carrying a firearm without a license is defined as carrying a firearm concealed on or about oneself, except in his place of abode or fixed place of business, without a valid and lawfully issued license. 18 Pa.C.S.A. § 6106(a)(1); *see also-Commonwealth v. Bavusa,* 750 A.2d 855, 857 (Pa. Super. 2000) (citations omitted). The record reveals that Jennings carried Officer White's gun outside of Jennings' place of abode, or business. N.T. Trial, 3/20/01, at 191; N.T. Trial, 3/22/01, at 217. Moreover, Jennings and the Commonwealth stipulated that Jennings was not licensed to carry a firearm in Pennsylvania. N.T. Trial, 3/23/01, at 3.

Escape is defined as unlawfully removing oneself from official detention. 18 Pa.C.S.A. §. 5121(a); *see also Commonwealth v. Edwards,* 595 A.2d 183, 184 (Pa. Super. 1991) (quotation omitted). "Official detention" means detention for law enforcement purposes. 18 Pa.C.S.A..§ 5121(e); *Edwards,* 595 A.2d at 184 (quotation omitted). The record reveals that Jennings unlawfully removed himself from the detention of Officers Knepper and White. Officer White testified that he., and Officer..

Knepper detained Jennings for a taillight infraction and for possession of marijuana. N.T. Trial, 3/20/01, at 176. Officer Knepper instructed Jennings to get out of his car, *id.* at 176, and, as soon as he got out of the car, Jennings immediately ran off, *id.* at 177. As we noted above, Officer White, who then pursued Jennings, testified that when he was later attempting to arrest Jennings, Jennings punched him in the left temple. *Id.* at 187. Jennings then wrestled him to the ground, *id.* at 187, removed a gun from Officer White's holster, *id.* at 191, and shot him in the right groin area, *id.* at 191-92, 198. Jennings then ran away with the gun. *Id.* at 194.

Resisting arrest or other law enforcement is defined as creating a substantial risk of bodily injury to a public servant, with the intent of preventing the public servant from effecting a lawful arrest. 18 Pa.C.S.A. § 5104; *see* **also Commonwealth v. Lyons, 555** A.2d 920, 925 (Pa. Super. 1995) (quotation omitted). The record reveals that Jennings created a substantial risk of bodily injury to Officer White, with the intent of preventing Officer White from effecting a lawful arrest. As we noted above, Officer White testified that he and Officer Knepper detained Jennings for a taillight infraction and for possession of marijuana. N.T. Trial, 3/20/01, at 176. Officer Knepper instructed Jennings to get out of his car, *id.* at 176, and, as soon as he got out of the car,.. Jennings immediately ran off, *id.* at 177. Officer White, who then pursued Jennings, testified that when he was later attempting to arrest Jennings, Jennings punched him in the left temple. *Id.*

at - 87. Jennings then wrestled him to the ground, *id.* at 187, removed a

gun from Officer White's holster, *id.* at 191, and shot him in the right groin

area, *id.* at 191-92 198. Jennings then ran away with the gun. *Id.* at 194.

Based on the foregoing, we find that the lower court did not err in

denying Jennings' motion for judgment of acquittal since there was sufficient

evidence to support all of the elements of the offenses for which Jennings

was charged.

Jennings next argues that the lower court erred in not granting his

motion for modification of sentence. Specifically, Jennings argues that his

sentences were inconsistent in that one was in the standard range while the

others were in the aggravated range.

> An appellant who challenges the discretionary aspects of a
> sentence in a criminal matter shall set forth in his brief a concise
> statement of the reasons relied upon for allowance of appeal
> with respect to the discretionary aspects of a sentence.    The
> statement shall immediately precede the argument on the merits
> with respect to the discretionary aspects of sentence.

Pa.R.A.P. 2119(f);  ***see also Commonwealth v. Penrod,*** *578* A.2d 486,

490 (Pa. Super. 1990) (stating that, even though the Commonwealth has

not objected to the absence of a 2119(f) statement, this Court may quash

an appeal where the appellant does not provide a 2119(f) statement).

Moreover, the argument section of a brief must have "such discussion and

citation of authorities as are ʿ deemed pertinent." Pa.R.A.P. 2119(a); see

***also commonwealth .v. Alsop,*** 799 A.2d 129, *135* (Pa.  Super. 2002)

("[T]he argument portion of an appellate brief must be developed with  aʹ

pertinent discussion of the point which includes citation to relevant authority. When the appellant fails to adequately develop his argument, meaningful appellate review is not possible. This Court will not act as new counsel.") (citations omitted).

Further, "[t] determine whether or not to grant permission to appeal from the discretionary aspects of sentencing., there must be a substantial question that the sentence is not appropriate under the `entire Sentencing Code." *Commonwealth v. Ousley,* 573 A.2d 599, 601 (Pa. Super. 1990) (citing 42 **Pa.C.S. § 9781(b);** *Commonwealth v. Tuladziecki,* **522 A.2d** 17 (Pa. 1987)). "To determine whether there is a substantial question warranting permission to appeal from the discretionary aspects of sentencing, we must ascertain if the Sentencing Code *as a whole* has been compromised." *Id.* (emphasis in original). An appellant must assert *"specific, articulablp reasons why his sentence compromises the sentencing* code." *Id.* (emphasis in original). "[A]ppeals from the discretionary aspects of sentencing are not to be granted as a matter of course, but are to be *granted only in exceptional cases where it can be shown ... that despite the* 'multitude of factors impinging on the sentencing decision,' the sentence *imposed contravenes the sentencing code." Id. (citing Tuladziecki, 522,* **A.2d at 20;** *Commonwealth v. Losch,* **369 Pa. Super. 192, 535 A.2d 1.15 (1987); and** *commonwealth v. Williams* 386 Pa. Super. 322, .562 ;A.2d.:, 1385 (1989)) (emphasis in original).

In the instant case, Jennings neither provided a 2119(f) statement nor set forth any authorities to support his argument that the lower court erred in not granting the motion to modify his sentence.    Moreover, because Jennings has failed to articulate any specific reasons why his sentence compromises the sentencing code, we find that he has. failed to raise a substantial question.    Therefore, we cannot reach the merits of Jennings' sentencing claim.

Jennings' final argument is that the lower court erred in not granting his post-sentence motion for discharge. Specifically, Jennings, relying on a newspaper article that was published, shortly after the motion to modify his sentence was denied, argues that his charges should have been dismissed since the Commonwealth violated the Pennsylvania . Rules of Criminal Procedure governing , discovery by requesting that the. FOP hold off on a grievance asking for a review of the incident leading to Jennings' arrest. Our standard of review is clear: "[Q]uestions involving discovery in criminal cases lie within the discretion of the trial court and will not be reversed unless such discretion was abused." *Commonwealth v. Miller,* 765 A.2d 1151, 1153 (Pa. Super. 2001) (citation omitted).

*Rule 573 of the Pennsylvania Rules of Criminal Procedure provides, in* pertinent part:

13

**(B)   Disclosure by the Commonwealth**

*(1)   Mandatory:*

In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the . defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items..

(a)   Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

*(2)   Discretionary With the Court:*

(a)   In all court cases, except as otherwise provided in Rule 230 (Disclosure of Testimony Before Investigating Grand Jury), if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing that they are material to the preparation of the defense, and that the request is reasonable:

(iv) any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice.

(D)   Continuing Duty to Disclose

If,  prior to or during trial, either party discovers additional evidence or material previously requested or ordered to be disclosed by it, which is subject to discovery or inspection under this rule, or the identity of an additional witness or witnesses,



14

such party shall promptly notify the opposing party or the court of the additional evidence, material, or witness.

**(E)    Remedy**

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

The United States Supreme Court's holding in *Brady v. Maryland, 373 U.S.* 83, 87 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutions" and the refinements of *Brady* in subsequent judicial decisions apply to all cases.    Pa.R.Crim.P.   573, Comment.    Favorable evidence is  material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth v. Burke*, **781 A.2d 1136, 1141 (Pa. 2001) (quotation omitted).**    **The materiality** inquiry is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (quotation omitted).

In the instant case, Christopher Lynch, President of the City of Erie Post Memorial Lodge Number 7 FOP testified at the motion to discharge hearing that the purpose of the grievance was to determine whether the Erie

15

Police had appropriate help in capturing Jennings, N.T. Motion to Discharge
Hearing, 7/3/01, at 33-34, not whether there was police misconduct in
capturing Jennings, *id.* at 37. We fail to see how evidence of a grievance
calling for the investigation into whether the Erie Police had appropriate help
in capturing Jennings creates a reasonable probability that the result of
Jennings' trial would have been different had such "evidence" been disclosed.
We, therefore, find that the trial court did not abuse its discretion in denying
Jennings' motion to discharge.

### III.   CONCLUSION

We find that the lower court did. not err in denying Jennings' motion for
judgment of acquittal since there was sufficient evident to support all of the
elements of the offenses for which Jennings was charged.    Moreover, we
refuse to grant allowance of appeal from the discretionary aspects of
Jennings' sentencing since he did not provide a 2119(f) statement, set forth
any authorities to support his argument, or articulate any specific reasons
why his sentence compromises the sentencing code. Further, we find that
the trial court did not abuse its discretion in denying Jennings' motion .to
discharge since the Commonwealth did not suppress favorable evidence
material to Jennings' guilt or punishment.

Judgment of Sentence affirmed.    Allowance of Appeal from the
discretionary aspects of sentence denied.

16